HANNA *v.* MALICK.

Religious Societies — Jurisdiction of Church Authorities — Seceding Members May Not Divert Control of Property.

Where the articles of incorporation and the by-laws of a local Orthodox Greek Church, as drafted and adopted by the original incorporators, who were natives of Syria, clearly express the intention to bring the church under the supreme authority and jurisdiction of the Patriarch of Antioch, those who adhere to that declaration of faith and recognized jurisdiction are entitled to the possession, control, and use of its property for its declared purpose as against those seceding from the original organization and seeking to divert its use and control to the jurisdiction of a Holy Russian Synod or patriarch.

Appeal from Kent; Brown (William B.), J. Submitted April 20, 1923. (Docket No. 59.) Decided June 4, 1923.

Bill by George N. Hanna and others against Moses Malick and others to enjoin the use of certain church property. From a decree for plaintiffs, defendants appeal. Affirmed.

*Howard A. Ellis* (*Jay W. Linsey,* of counsel), for plaintiffs.

*John J. McKenna* (*Harry E. Rodgers,* of counsel), for defendants.

STEERE, J. The parties to this suit represent opposing factions in an incorporated religious association of members of the Greek Church faith located in the city of Grand Rapids, Michigan. The issue raised involves the right between the two factions under its

On determination by the civil courts of property rights between contending factions of an independent or congregational church, see notes in 32 L. R. A. 92; 8 A. L. R. 105.

articles of association and by-laws, as originally adopted, to possess, occupy and use for purposes of its organization the church property belonging to said corporation.

In October, 1910, plaintiffs and other natives of Syria then residing in Grand Rapids organized for religious purposes and incorporated pursuant to the provisions of Act No. 209 of the Public Acts of 1897, under the name of St. George's First Syrian Greek Orthodox Church of Grand Rapids, Michigan. In their articles of association they expressly stated the purpose for which they incorporated was:

"To teach and promulgate the Christian religion in accordance with the tenets and doctrines and creed of the Syrian Greek Orthodox Church of Antioch, Syria, and the Syrian Greek Orthodox Church of America, as expounded by the bishop thereof, resident at Brooklyn, New York, United States of America."

In their duly adopted by-laws they provided amongst other things that:

"All persons believing in the divinity of Christ, in God the Father and the Holy Ghost, the sacrament of baptism and marriage in accordance with the articles of faith established by the Orthodox Greek Church of Damascus, Syria, shall be entitled to membership.

"Members are admitted by baptism and by confession of faith under the rules and tenets of the Orthodox Greek Church of Damascus, Syria. They may be suspended or expelled for violation of the teaching and precept of the church as laid down and expounded by the bishop of the Syrian Greek Orthodox Church of America, resident at Brooklyn, New York. * * *

"The title to all property shall rest in the corporation." * * *

The story of this litigation and its causes appears to hark back to the dawn of Christianity and comprises a record of over 800 pages. The case has been carefully prepared and well briefed by able counsel, and the learned circuit judge who heard it has taken

pains to review the subject in an interesting opinion embodying the salient facts condensed from the voluminous testimony.     After a careful study of this record we find no occasion to disturb the conclusions he arrived at and in the main adopt his opinion, as follows:

"About the year 65 A. D., at the city of Antioch, a community organization was effected of those who professed belief in the teachings of Christ under the leadership of St. Paul, and they took unto themselves and then adopted the name of Christians, which organization afterwards was called the Christian Church.

"At first the growth of the Christian Church was slow and beset with many difficulties.    In the third century this church became popular and the leaders and rulers of the different nationalities of people who then lived separate from each other in the different geographical divisions of the then known world located near the Mediterranean Sea, outwardly, at least, expressed belief in the faith of this church, and then the religion of Christ was very rapidly adopted by the people of these different territories and nationalities. Thus we find about the third century the Christian Church established in the different countries of the then known world, each nationality in the main constituting a diocese of the church.    The church head of each diocese was called a patriarch.    The first five dioceses were Constantinople, Alexandria, Antioch, Jerusalem and Rome.    The powers and duties of the patriarchs were co-ordinate and equal each within his own diocese.    There was established over the dioceses an ecumenical council subject to call, which had jurisdiction over matters and questions having to do with the laws, creed, doctrines of faith and ecclesiastical matters of the church generally and with questions which might arise between two or more dioceses. From the beginning to the present time it has been the rule of these dioceses that a person desiring church fellowship and going from one diocese into another, must come under and submit to the authority of the patriarch of the diocese into which he comes.

No priest or other ecclesiastical officer of the church could go from one diocese into another without the permission of the patriarch of the diocese from which he would go and the consent of the patriarch of the diocese into which he would go.    This ecumenical council established the laws and regulations for the government of the Christian Church and established the creed and doctrines of faith of its members.    A study of the work done by this council shows that many church questions were unsettled in the minds of the church authorities, such as questions of creed, of faith, of redemption, of transubstantiation, etc.

"From the time of Christ to the year 1054 A. D. the entire Christian Church was under the rule and direction of the patriarchs subject to the authority of ecumenical councils so far as such authority was exercised, and during all that time the Christian Church which came from the organization at Antioch in 65, under St. Paul, and in each and all the dioceses, was known as the Greek Orthodox Church, each and all having the same creed, tenets and doctrines of faith.

"It will be understood that from about the eighth century until 1054 A. D., the diocese of Rome was more or less dissatisfied with its connection with the Greek Orthodox Church and had more or less directly intimated its intention to withdraw from the councils of the Greek Church and had changed the name of its patriarch to that of bishop.    In 1054 A. D., the diocese of Rome, under the leadership of its then so-called bishop, effectually and absolutely broke away from the jurisdiction of the Greek Orthodox Church and established the western church, being the Roman Catholic Church, thus leaving the dioceses of Constantinople, Alexandria, Antioch and Jerusalem under the Greek Orthodox Church and comprising the eastern church.

"It appears in the distribution of territory by the ecumenical council to the different dioceses that the unknown and undiscovered territory to the east of the then known world was placed under the Patriarch of Constantinople and was known as 'all the east.' This unknown territory, or some of it, described as 'all the east' was known to contain races of people then not brought under civilization and referred to as

barbarians. Hence comes the reference to the Greeks and barbarians as distinguished from the Romans. The unknown territory peopled with barbarians was all the world to the east of the then known Mediterranean states, and, if carried far enough in theory, would include the western hemisphere and thus would include the United States, and in theory all the people of the world not within these five dioceses were included within the term 'barbarians' as then used.

"The separation of the western church from the eastern church in 1054, that is, the Roman Catholic Church from the Greek Orthodox Church, is known as the split or schism in the Greek Orthodox Church. From this time until the sixteenth century no changes as to dioceses is noted in the territorial jurisdiction of these churches. Within this time civilization had made some progress to the east, and in the sixteenth century Russia began to take political form, and under the authority of the ecumenical council which had conferred upon and attached to the diocese of the Patriarch of Constantinople 'all the east,' which included Russia, and upon the establishment of the Greek Orthodox Church in Russia, it being under the jurisdiction of the Patriarch of Constantinople, a head for and over the Greek Orthodox Church in Russia was appointed by the Patriarch of Constantinople who was subordinate to the Patriarch of Constantinople, and in this manner for a period of years the Greek Orthodox Church in Russia was governed and directed as a part of the diocese of and subject to the authority and jurisdiction of the Patriarch of Constantinople.

"Later, the church in Russia broke away from the authority of the Patriarch of Constantinople and for a period of years had no officially constituted head. In the latter part of the eighteenth century a synod was formed by the independent authorities of the Russian Greek Orthodox Church and the government of Russia, having authority over the affairs of the Russian Greek Orthodox Church known as the Holy Synod of Russia, and from that time the Russian Greek Orthodox Church under the jurisdiction of the Holy Synod of Russia has been recognized by the Patriarchs of Constantinople, Alexandria, Antioch, and Jerusalem, as a co-ordinate diocese of the Greek Orthodox Church.

Thus it is that the Russian Greek Orthodox Church
arbitrarily withdrew from the diocese of the Patriarch
of Constantinople and set up an independent church
diocese without let or consent on the part of the then
constituted Greek Orthodox Church authorities.

"Prior to the purchase of Alaska from Russia in
1867, the Russian church had established one or more
churches in the territory of Alaska.   By virtue of
having established in the western hemisphere a Rus-
sian church, and the territory wherein the church was
established having been purchased by the United
States, the Russian Church now claims the right to
rule over and assumes jurisdiction over all Greek
Orthodox churches within the United States regard-
less of the nationality of the congregation or the mem-
bership of the local church.   The Russian Church
being associated with and supported by the Russian
government, rapidly became wealthy and prosperous
and was able to enlarge its operations, to establish
and extend its missions and pay the expenses of its
church officers and assistants, which condition has
continued to the present.

"The diocese of Antioch (although the city of
Antioch was founded about 300 B. C., and became a
leading city of the world and was called the 'queen
city of the east' and was the capital of Syria) emerged
from the dark ages in a poor and impoverished con-
dition, commerce and trade having shifted to the more
prosperous city of Damascus, and in time the head-
quarters of the Patriarch of Antioch were moved from
Antioch to Damascus.

"Between 1885 and 1890, at which time Syria was
a part of the Turkish Empire, Syrians began to come
to the United States, settling or colonizing in the city
of New York.   About 1890, the Syrian colony in
New York had acquired such numbers that they were
in need of organization for their church and charitable
purposes and accordingly, no priest or other officer of
the church having come to the United States, these
Syrians made several requests upon the Patriarch of
Antioch that he send to them at New York a priest
to organize and take charge of their church affairs
that their church rites, marriages, funerals, etc.,
might be attended to in conformity with the regula-

tions of the Syrian Greek Orthodox Church as prescribed and practiced by the Patriarch of Antioch, their mother church.

"The Patriarch of Antioch, being at that time very poor and being unable to help his people in New York, gave no heed to the requests of his people in New York. However, in 1892, a Syrian priest named Terazy voluntarily came to New York, was welcomed by the Syrians there and attempted to minister to their needs, but, owing to their fewness in number and limited financial means, he was unable to maintain himself and was obliged to go back to Syria in the same year. Later and in the same year the Syrian archmandrite Gebara voluntarily came to New York, and was welcomed by his people, and the Syrians of New York secured a place for religious worship at the corner of Cedar and Washington streets but, owing to lack of financial means, his stay in New York was short. In 1894, the number of Syrians had so increased in New York that they had organized a society or congregation, and in April, 1895, more determined steps were taken to procure a priest.

"Raphael Hawaweeny was born of Syrian parents in 1860. He was reared and educated in the Orthodox schools of Damascus. In 1874 he adopted a clerical career. He became a pupil of Irotheius, Patriarch of Antioch, in Damascus and resided in the mansion with the patriarch and was ordained a monk in 1879. In 1879, the patriarch sent him to a Greek theological school at Constantinople, where he graduated in 1886, and was then ordained an Antiochian deacon and went into the service of the Metropolitan of Akkar, Syria. Gerosimos I succeeded Irotheius as Patriarch of Antioch and appointed Deacon Raphael as one of his attendants. In 1887, Deacon Raphael was allowed by the Patriarch of Antioch to take a post-graduate course in theology at Moscow, Russia, and in 1889, the Patriarch of Antioch dismissed the representative of the Antioch diocese at Moscow and requested of Bishop Selveistros, head of the Kiev academy at Moscow, to ordain Deacon Raphael a priest in order that Raphael might be appointed representative of the Antiochian diocese at Moscow, which was done. In going from Antioch to Moscow Raphael

went with the consent of the Patriarch of Antioch and the permission of the Holy Synod of Russia but did not change his church affiliation or separate himself from the church of the Patriarch of Antioch.

"After the Syrian people of New York made several requests upon the Patriarch of Antioch for assistance and because of lack of financial ability the patriarch failed them, a request was made by the Syrians of New York upon the Holy Synod of Russia to assist them in obtaining a priest and that Raphael be allowed to come to New York and take charge of the affairs of the Syrian Church. To this Raphael and the Holy Synod of Russia consented. Raphael, who was then an archmandrite, came to New York November 14, 1895, where he at once took charge of the Syrian Greek Orthodox Church and the social affairs of the Syrian people of New York and applied himself assiduously in the interest of his church and countrymen but without a title other than as pastor of his Syrian congregation; that is, he had no title conferred upon him by reason of his being in the United States. From 1895 to 1904, Raphael was head of the Syrian Greek Orthodox Church in the United States, directing its affairs temporal and spiritual without titular denomination; and in that time the numbers of his countrymen greatly increased, different local churches and missions were established which were presided over by local priests, and the Syrian Church had acquired such magnitude that it was deemed necessary that a regularly constituted head should be established in the United States. Accordingly a request was made upon the Patriarch of Antioch that Raphael be appointed Bishop of Brooklyn. There was no Syrian Church official in the United States empowered to ordain and consecrate a bishop, and the expense of bringing the necessary officials from Damascus to New York prohibited the Patriarch of Antioch from performing the ordination and consecration of Raphael as Bishop of Brooklyn.

"At this time and for years prior, the Russian Greek Orthodox Church had in the United States several bishops and, on the order of the Patriarch of Antioch and upon the consent of the Holy Synod of Russia, it was arranged that two Russian bishops in

the United States should perform the ceremony of ordaining and consecrating Raphael as Bishop of Brooklyn, which was done in 1904. Raphael was Bishop of Brooklyn from 1904 until the time of his death, which was February 18, 1915.

"During the time Raphael was in the United States no question was ever raised as to his authority to administer the affairs of the Syrian Greek Orthodox Church in the United States, or as to his superior church authority. He was a Syrian, native born. He presided over the affairs of Syrian churches whose members were solely of Syrian birth and nationality. Raphael as bishop or otherwise had no connection or relations with the Russian Greek Orthodox Church. He applied his entire time, energy and ability to the affairs of the Syrians, his countrymen, in and through the Greek Orthodox Church.

"Immediately upon the death of Raphael the question as to the appointment of his successor was raised. The day after his burial a meeting was held of the Syrian priests who were present at his funeral, and a division of minds existed and was then expressed as to whether or not Raphael as Bishop of Brooklyn was subordinate to the Holy Synod of Russia or to the Patriarch of Antioch, and whether the successor of Raphael as Bishop of Brooklyn should be a Syrian or whether he might be a Russian.

"It is a requirement of the Greek Orthodox Church that a priest in saying mass in performing the service of the church must recognize and state in the service himself, his immediate superior church authority.

"In October, 1910, and while Raphael was bishop, St. George's First Syrian Greek Orthodox Church of Grand Rapids, Michigan, was organized. In the articles of association, among other things, it is said: 'All persons believing * * * in marriage in accordance with the articles of faith established by the Orthodox Greek Church of Damascus, Syria, shall be entitled to membership.' Also, 'Members are admitted by baptism and by confession of faith under the rules and tenets of the Orthodox Greek Church of Damascus, Syria.' From the time of the organization of this local church to the death of Bishop Raphael there was no trouble in the local church in regard to the forms

of worship practiced by the local priest.   The local priest attended the funeral of Bishop Raphael, and upon his return therefrom he brought before his congregation a paper which he asked the members of his church to sign, which was a declaration of loyalty by the local church members to a Russian bishop who had been elected or nominated by the priests assembled in Brooklyn immediately after the burial of Raphael, as successor to Bishop Raphael.   The plaintiffs herein refused to subscribe to this writing and refused to allow the priest to mention the name of a Russian bishop as his highest authority in the church, and they insisted that the priest should mention the name of the Patriarch of Antioch as his highest church authority until a duly appointed Syrian bishop should be named as Bishop of Brooklyn to succeed Bishop Raphael.   When it was known that certain members would not subscribe to this writing as requested by the priest in this regard certain members of the church who were willing to subscribe to the authority of the Russian bishop as successor of Bishop Raphael attempted to amend the articles of association of the local church by placing the church property and church service in the name of and under the immediate control of the Holy Synod of Russia.   Under the articles so amended the priest conducted church services, recognized the Russian bishop as his church authority and claimed that the church property was under the authority of the Russian Church.

"The plaintiffs herein claim to be of the original incorporators of the church and claim that they have been ousted from this property, and that the defendants have illegally and without any right taken possession of the church property and are illegally holding possession of it and are preventing the plaintiffs from their just and rightful use of the property of the church for their church services in accordance with the original articles of association and as originally intended by the incorporators.

"It appears in this case that on the 8th day of October, 1910, George N. Hanna, Edward Ellis, Rev. Phillipous Abo-Assaley, Shaheen Slayman, Mansur Halalley, and Abdo Saloun Yared signed and executed

articles of association of a church to be known in law as St. George's First Syrian Greek Orthodox Church of Grand Rapids, Michigan, and that in and by such articles it was provided in article 2 that: 'The purpose or purposes for which it is formed are as follows: To teach and promulgate the Christian religion in accordance with the tenets and doctrines and creed of the Syrian Greek Orthodox Church of Antioch, Syria, and the Syrian Greek Orthodox Church of America, as expounded by the bishop thereof resident at Brooklyn, New York, U. S. A.' Those articles were prepared by Sybrant Wesselius, an attorney at law of Grand Rapids, Michigan, after he had asked these men under what jurisdiction this contemplated church was claimed by them to be. He also prepared by-laws, and these by-laws conform to the articles of association in that they provide among other things that: 'All persons believing * * * in marriage in accordance with the articles of faith established by the Greek Orthodox Church of Damascus, Syria, shall be entitled to membership;' and that, 'Members are admitted by baptism and by confession of faith under the rules and tenets of the Orthodox Greek Church of Damascus, Syria.' After the above articles and by-laws were duly executed, they were duly and legally filed with the register of deeds of the county of Kent on the 10th day of October, 1910, and with the secretary of State on the 11th of October, 1910, in pursuance to Act No. 209 of the Public Acts of 1897, of Michigan. Following the execution and filing of such articles of association and by-laws said corporation, known as St. George's First Syrian Greek Orthodox Church of Grand Rapids, Michigan, it purchased and now owns certain real estate in the city of Grand Rapids described as lots 15 and 16 of block 16, of Ellsworth's addition to the city of Grand Rapids, Michigan, and established a church edifice thereon. It appears that subsequently the members of said corporation, together with other persons who were admitted to membership from time to time, continued to worship and hold services in accordance with the articles of association and by-laws and in conformity to and in pursuance of the tenets, doctrine and creed of the Antiochian Greek Orthodox Church

until on or about the 28th day of February, 1915, immediately subsequent to which time a dissension arose in the ranks of the local church members and elsewhere in this country as to whether the members of the congregation were subject to the jurisdiction of the Patriarch of Antioch or of the body known as the Holy Synod of Russia.

"Plaintiffs claim that they organized under and have always been subject to the supreme jurisdiction of the Syrian Greek Orthodox Church of Antioch, Damascus, Syria, whose head is the patriarch and whose representative in America was Bishop Raphael of Brooklyn.

"The defendants claim that this local church was organized under and has always been subject to the supreme jurisdiction of the Russian Greek Orthodox Church, whose head is the Holy Synod of Russia. The Syrian Greek Orthodox Church of Antioch, Syria, and the Russian Greek Orthodox Church of Russia are separate, distinct, independent churches of the same faith, to wit, the Greek Orthodox Church.

"This case does not directly involve any ecclesiastical question or any question of church rights of a religious nature or service to be performed by the church for the individual, but simply involves a question of the title to and the right to possession and use of the above described real estate. The testimony in the case on ecclesiastical questions has a bearing only upon the intentions of the original incorporators of the corporation as to the ownership and control of this real estate. The bishop of the Syrian Greek Orthodox Church of America, resident at Brooklyn, New York, as described in the original articles of association, was Bishop Raphael. He was a native born Syrian who had been elevated to the priesthood and archmandricy by the Patriarch of Antioch, and in 1895 he was in Russia, having gone there at the instance of the Patriarch of Antioch and in the interests of the Syrian Greek Orthodox Church. By reason of the fact that the Patriarchate of Antioch was extremely poor and had no means to furnish a pastor for the Syrians of New York and was in part sustained by donations from the Holy Synod of Russia, the head of the Russian branch of the Greek Orthodox

Church, it was unable to assist the Syrians of New York in their organization and maintenance of a church, but upon the permission of the Patriarch of Antioch and the consent of the Holy Synod of Russia Raphael was ordained and consecrated as Bishop of Brooklyn.    After Bishop Raphael came to America and was consecrated as bishop of the Syrian Greek Orthodox Church in America, he took complete charge of the affairs of the Syrian Greek Orthodox Church in America, and so far as is shown, all the Syrian literature available as bearing upon the laws and tenets and government and authorities of the Syrian Greek Orthodox Church in the United States is found in Raphael's Magazine known as Al Kalamat, which he himself published in the Syrian language.    From this magazine, Al Kalamat, published by Bishop Raphael, we quote, Vol. 1, page 2:

" 'That he (Raphael) was consecrated bishop by the order and permission of Melatois, the Patriarch of Antioch.'

"Vol. 2, page 95:

" 'Those who were consecrated bishops through his (Patriarch of Antioch) consent were his grace, Basileus Dibs, the Metropolite of Akkar, Syria, one of the Antiochian dioceses, and the owner of this magazine, the Bishop of Brooklyn, New York, U. S. A.'

"Vol. 2, pages 95-96:

" 'Patriarch Melatois counted the new parish of Brooklyn, New York, as one of the parishes of Antioch.'

"Vol. 2, page 95:

" 'And during his (Melatois) administration (as patriarch) many unusual things took place, such as the demise of several lamented archbishops.    For this reason a conclave was had of archbishops, his beatitude presiding, during which conclave there were elected bishops for the seats vacated by such deaths. * * * Those who received the benediction of ordination into the high priesthood by the sanction of his beatitude are two, to wit, his eminence, Basileus Dibs, archbishop of Akkar, and the editor of this magazine (Bishop Raphael) Bishop of Brooklyn, North America. * * * And the territorial jurisdiction of the See of Antioch became much more extensive during the

time of his beatitude, for Syrians who emigrated to many other countries still retained their spiritual relations with and continued to acknowledge and yield allegiance to their mother church, the Holy Church of Antioch, and kept firm in the Orthodox faith. His beatitude manifested the most perfect evidence of his interest in and care for them to the best of his means and ability. In substantiation of this, when the Russian Holy Synod informed him that the lot of presiding in this diocese (the diocese of Brooklyn) had fallen upon our humble self (Raphael), his beatitude hastened to write to the Holy Synod, to His Eminence Tikon, then Archbishop, and to our humble self sanctioning the choice and declaring that he (his beatitude) had instituted this new diocese as one of the dioceses pertaining to the See of Antioch; and thus it is in actuality notwithstanding its nominal allegiance to the Russian Holy Synod.'

"Vol. 2, page 18:

"'Whereas, we, the Syrian Orthodox residents of greater New York and all other parts of North America constituting our new diocese (may God keep it) are considered a vigorous branch of our mother tree, the Church of Antioch; and whereas, this branch has flourished luxuriantly during the days of the administration of our father, may his name be ever blessed, the thrice illustrious Patriarch Melatois and whereas, his beatitude was the first to sanction and bless the establishment of this new Syrian diocese in this new world.'

"Quotations from this magazine may be extended, but it is sufficient to say that at first the writings of Bishop Raphael gave to the Patriarch of Antioch jurisdiction over the Syrian branch of the Orthodox Church in the United States, and later gave expression to language indicating that all the branches, including the Syrian branch, of the Greek Orthodox Church in America were under the jurisdiction of the Holy Synod of Russia.

"As showing that the question of jurisdiction over the Greek Orthodox Church in America is in some doubt, we quote from two standard authorities. Funk & Wagnalls' Religious Encyclopedia, published in 1909, says:

"'Orthodox congregations in the United States for those of Syrian nationality date from 1895 when the Russian Bishop

223—Mich.—8.

Nicholas brought with him the Very Rev. Archmandrite Raphael Hawaweeny and founded a church for Orthodox Syrians in New York City. * * * In 1904 the Patriarch of Antioch elevated Raphael to the rank of bishop, and he was consecrated by the Russian Bishops Tikon and Innocent. * * * There are ten churches under his jurisdiction, and the membership of his flock is about forty-five thousand.'

"The Encyclopedia Britannica, published in 1911, says:

"'Undoubtedly, the question of most pressing importance with regard to the future of the eastern church is the relation between Russia and Constantinople. The ecumenical patriarch is, of course, officially the superior; * * * The Russian church * * * has shown an increasing tendency to intervene in the affairs of the three lesser patriarchates. * * * The Russian Church is the only one which is in a position to display any missionary activity. In America the Russian archbishop, who resides in New York, has (on behalf of the Holy Synod) the oversight of some one hundred and fifty-two churches and chapels in the United States, Alaska and Canada. He is assisted by two bishops, one for Alaska, residing at Sitka, and one for Orthodox Syrians, residing in Brooklyn.'

"The question for determination before this court is not presented by the heads of the two branches of the Greek Orthodox Church under which the parties here make claim, but the issue here is between members of the local church as to the control and occupancy of the real estate owned by the local church association. Much testimony has been taken in the case bearing upon the organization and history and growth of the Greek Orthodox Church as a church. This testimony bears upon the ecclesiastical questions which might arise between the branches of the Greek church and, as is above said, is to be considered in this case only upon the question of the intention of the original incorporators of this local church.

"The plaintiffs in this case claim that at the time of the incorporation of this local church they vowed allegiance to the Patriarch of Antioch, who upon Bishop Raphael's death would be the next higher authority of the local priest of this local church, and the plaintiffs contend that the church is now being used for a purpose foreign to the purposes set forth

in the articles of association and by-laws. Plaintiffs claim the right to use this church for the purposes as expressed in the original articles of association and by-laws and deny the right of the defendants to use it for a different purpose, that is, the purpose of teaching and promulgating the 'Christian religion in accordance with the doctrines of the Syrian Greek Orthodox Church as promulgated by the Syrian Bishop of Brooklyn, New York, head of the Syrian Greek Orthodox Mission in America, who is subject to the supervision, control and instructions of the Holy Russian Synod, and to own and hold both real and personal property for that purpose;' this being the substance of the amendment to the articles of association by the defendants, which amendment the plaintiffs claim to be illegal and of no effect.

"In view of the writings of Bishop Raphael above referred to and in view of the fact that the standard authorities above quoted are not in harmony as to the highest church authority over the branches of the Greek Orthodox Church in the United States, it is not strange that the original incorporators of the local church were not more specific in the expression of the terms of its articles of association as to its highest church authority, if it may be said that more specific expression is necessary to give such intention.

"The plaintiffs in this case are of Syrian birth. They came directly to the United States from the land of their fathers within the diocese of the Patriarch of Antioch. In the city of Antioch, under the leadership of St. Paul, was established the first organization called the Christian Church, which church the Syrians, including these plaintiffs, claim to have continued and maintained and given to the world, and it is not unreasonable that they would have a just pride in worshipping in a church under the articles of faith established by and promulgated under the direction of the Patriarch of Antioch. During Raphael's entire administration of church affairs in the United States the record shows but one instance where he was directed by any church authority, that being in August, 1910, when Bishop Raphael communicated to the Syrian people of America through Al Kalamat an order which he had received from the Patriarch of

Antioch concerning marriages of members of the Syrian Greek Orthodox Church in America. In 1901, Bishop Raphael published in Al Kalamat, Vol. 1, page 79, that he had received a telegram from the Patriarch of Antioch that he, Bishop Raphael, had been elected Metropolite of Salefkias. This election Raphael declined. This election and communication from the Patriarch of Antioch has a bearing upon the relation presumed to exist between Raphael and the Antiochian branch of the church.

"It is entirely within reason that during all the time Raphael was at the head of the Syrian Church in the United States the Russian 'Church authorities were giving orders to and directing the affairs of the Russian branch of the Greek Orthodox Church in the United States. It is not shown in this case that during the life of Raphael the authorities of the Russian Church in any manner gave any orders to the Syrian branch of the church or attempted in any way to direct the actions or utterances of Raphael in his relations with the Syrian Church.

"As we have above intimated, the issue in this case does not involve church or ecclesiastical rights. It does involve the possession and ownership of real estate. The articles of association and by-laws as drafted and adopted by the original incorporators clearly express the desires and intentions of the original incorporators to bring the church service of the local church under the supreme authority of the Patriarch of Antioch. If this were a lawsuit between the Patriarch of Antioch, on the one hand, and the Holy Russian Synod on the other hand, each contending for supremacy over this property by reason of laws, canons and rulings promulgated by the ecumenical council over the Greek Orthodox Church, it is possible that a different question might be raised. The issue here is between the members of a church in which there has been a schism, their differences arising immediately after the death of Bishop Raphael over the question as to who is to be mentioned by the priest in the saying of mass in the church as his authority.

"This property was purchased by the incorporators for the worship of God under the discipline of a

particular religious association within the jurisdiction and, under the guidance and direction of the Patriarch of Antioch, and after the death of Raphael the defendants have attempted to transfer the title of the property and its control and direction to the authority and under the discipline of another religious body known as the Holy Synod of Russia. It is not essential to the ownership of property or to the intention to hold and own property by any certain religious association that it shall be organized according to the rules of a particular church. Within the United States there is no law requiring or regulating the establishment of religion or directing how people shall worship. An entirely independent church may be organized and assume to be governed by certain laws, creeds and doctrines of faith as promulgated by some other established church, yet it would not necessarily become a subordinate part of such regularly established church or amenable to its authority.

"Article 1 of the amendments to the Constitution of the United States says:

" 'Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.'

"Article 1 of an ordinance for the government of the Northwest Territory says:

" 'No person demeaning himself in a peaceable and orderly manner, shall ever be molested on account of his mode of worship or religious sentiments, in said territory.'

"Section 3 of article 2 of the Constitution of the State of Michigan, 1908, says:

" 'Every person shall be at liberty to worship God according to the dictates of his own conscience.'

"In *Fuchs* v. *Meisel*, 102 Mich. 357 (32 L. R. A. 92), quoted with approval in *Borgman* v. *Bultema*, 213 Mich. 705, it is said:

" 'In the freedom of conscience and the right to worship allowed in this country, defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. But they could not take with them for their own purposes or transfer to any other religious body the property dedicated to and conveyed for the worship of God

under the discipline of this religious association; nor could they prevent its use by those who choose to remain in the church, and who represent the regular church organization. If complainants maintain the allegations of their bill,—that they represent the regularly organized body of the church and are its regular appointees,—they are entitled to the relief prayed.'

"From the articles of association and by-laws as originally drafted it clearly appears that 'The purpose or purposes for which it is formed are as follows: To teach and promulgate the Christian religion in accordance with the tenets and doctrines and creeds of the Syrian Greek Orthodox Church of Antioch, Syria;' and that 'All persons believing in   *   *   *   marriage in accordance with the articles of faith established by the Orthodox Greek Church of Damascus, Syria, shall be entitled to membership;' and that, 'Members are admitted by baptism and by confession of faith under the rules and tenets of the Orthodox Greek Church of Damascus, Syria.'

"The attempt of the defendants to amend the articles of association and by-laws as originally drafted, so as to place the supervision, control and instructions of this local church and the church property herein described within the ownership and under the direction and authority of the Holy Synod of Russia, was unwarranted and illegal and of no force or avail.

"The court concludes that the plaintiffs have been illegally deprived of the possession and control of the church property and premises in question; plaintiffs have maintained the allegations of their bill, and they represent the regular church organization. This opinion makes no decision as to ecclesiastical authority or conflict of authority of different branches of the Greek Orthodox Church within the United States."

Plaintiffs are evidently moved to this controversy by a religious sentiment involving community of race, language and reverence for the ancient church as organized in the land of their nativity, rather than by differences with the opposing faction in the fundamentals of their faith or mode of worship. The purpose and intention of the original incorporators to legally stamp with those distinctions this church of

their faith organized by them in the land of their adoption is plainly declared in their corporate articles of association and repeated in the by-laws.    They acquired and consecrated to that particular purpose the property in controversy here.    The efforts of the clergy of the Russian hierarchy to absorb this property is in harmony with its reported "increasing tendency to intervene in the affairs of the three lesser patriarchates."    In view of the chaotic condition of affairs in that church resulting from the Russian revolutions which destroyed all relations of church and state, the precautions taken in organizing this Syrian church seem to have justified themselves.

Those who thus organized this Syrian ecclesiastical society, acquired the property in question for the purposes of the organization and thereafter adhered to that declaration of faith and recognized jurisdiction are entitled to the possession, control and use for such purposes of the property so acquired as against those seeking to divert its use and control to the jurisdiction of a Holy Russian Synod or patriarch, if either yet survive the atheistic and anarchistic conditions existing in Russia.

The decree will stand affirmed, with costs to plaintiffs.

FELLOWS, MCDONALD, CLARK, SHARPE, and MOORE, JJ., concurred.    WIEST, C. J., and BIRD, J., did not sit.