MACEDONO-BULGARIAN ORTHODOX CHURCH SAINT
CLEMENT OHRIDSKI *v.* MACEDONIAN PATRI-
OTIC ORGANIZATION FATHERLAND

KUROP *v.* YOVAN

OPINION OF THE COURT

1. RELIGIOUS SOCIETIES—ECCLESIASTICAL SCHISMS—CHURCH PROP-
ERTY—OWNERSHIP—COURTS—CONSTITUTIONAL LAW.

Civil courts are constitutionally forbidden to delve into areas
of apparent ecclesiastical schisms in order to decide which
religious faction owns or has a right to certain church prop-
erties (US Const, Am 1).

2. RELIGIOUS SOCIETIES—ECCLESIASTICAL SCHISMS—CHURCH PROPER-
TY—OWNERSHIP—COURTS.

The Court of Appeals could not resolve a church property dispute
involving two apparent schisms where, in order to reach its
decision, the Court would have to determine: (1) the effect of
actions taken by one church group to form a new diocese in-
dependent of the Bulgarian Holy Synod; (2) the power of the
Russian Orthodox Church Outside of Russia to ordain a bishop
in the Bulgarian Eastern Orthodox faith; and, (3) which
faction in the plaintiff church represented the faithful minority
at the time the dispute arose between the parties.

3. CONSTITUTIONAL LAW—RELIGIOUS SOCIETIES—PROPERTY—DISPUTES
—COURTS.

The First Amendment to the Federal Constitution severely cir-
cumscribes the role that civil courts may play in resolving
church property disputes and commands that courts decide
such disputes without resolving underlying controversies over
religious doctrine (US Const, Am 1).

REFERENCES FOR POINTS IN HEADNOTES
[1–9] 45 Am Jur, Religious Societies § 65 *et seq.*
Change of denominational relations or fundamental doctrines by
majority faction of independent or congregational church as
ground for award of property to minority.  15 ALR3d 297.

4. RELIGIOUS SOCIETIES—CONSTITUTIONAL LAW—COURTS.

> Civil courts cannot determine ecclesiastical questions because such determinations would be wholly inconsistent with the American constitutional concept of separation between church and state (US Const, Am 1).

DISSENTING OPINION
HOLBROOK, P. J.

5. RELIGIOUS SOCIETIES—MEMBERS' WITHDRAWAL—CHURCH PROPERTY —OWNERSHIP.

> *Members of a religious organization, in the free exercise of their beliefs, have an undoubted right to withdraw from that organization, with or without reason, but they cannot take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of the religious organization from which they are withdrawing, nor can the withdrawing members prevent the use of that property by the nonwithdrawing members who represent the regular religious organization.*

6. RELIGIOUS SOCIETIES—ORDAINED PRIEST—DEFROCKMENT—COURTS —JURISDICTION.

> *Defrockment of an ordained priest of a religious organization is an ecclesiastical matter and is not within the jurisdiction of civil court; the courts accept such defrockment as an accomplished fact for the purposes of determining ownership of church properties held by that defrocked leader.*

7. RELIGIOUS SOCIETIES—ORDAINED PRIEST—DEFROCKMENT—CHURCH PROPERTY—OWNERSHIP.

> *Defrocked priest who, with his adherents, voluntarily left plaintiff church and affiliated with another religious organization, was properly required by the trial court to account for church properties in his possession, or coming into his possession, to turn over such properties to plaintiff church, and to refrain permanently from attempting to conduct religious services in or on premises owned by plaintiff church, or to use any of its properties, until such time as plaintiff church reinstated him.*

8. RELIGIOUS SOCIETIES—CHURCH PROPERTIES—DIVISION BY MAJORITY —RIGHTS OF MINORITY.

> *The membership of a congregation, which is one of several congregations belonging to a particular religious faith to which*

*the local church property and practice is dedicated, does not have the right to effect, by vote of a momentary majority, a change in religious practice, not conformable with the origin and historic character of the faith of the church of which the local congregation is one member, as against those who faithfully adhere to the characteristic doctrine of the church, and thereby deprive the faithful minority of the use of the church property.*

9. RELIGIOUS SOCIETIES—CHURCH PROPERTIES—DIVISION BY MAJORITY—RIGHTS OF MINORITY.

*Property dedicated in the articles of association of a Michigan ecclesiastical corporation to worship according to the doctrine and belief of a recognized, established mother church cannot be changed in its use by a change in religious practice by a vote of a momentary majority and the faithful minority thus be deprived of the property held by the corporation.*

Appeal from Wayne, Thomas J. Foley, J.   Submitted Division 1 June 5, 1969, at Detroit.  (Docket Nos. 5,079, 5,080.)   Decided February 3, 1970.  Rehearing granted April 13, 1970.

Complaint by Macedono-Bulgarian Orthodox Church Saint Clement Ohridski, a Michigan ecclesiastical nonprofit corporation, against Macedonian Patriotic Organization Fatherland, a Michigan nonprofit corporation, and George Nicoloff for an injunction restraining George Nicoloff from conducting services in the church, and from using the church's property, and for an accounting.  Complaint by Gilbert Kurop, Paul G. Kostoff, Nick Thomas, George K. Panzoff, and Jordan Tanasoff against Alexander Yovan, James Sotiroff, Thomas Griffen, P. Joseph Pascoff, Steven Kircos and Macedono-Bulgarian Orthodox Church Saint Clement Ohridski, a Michigan ecclesiastical nonprofit corporation, for a determination of the proper governmental body of the temporal affairs of the church, appointment of a receiver and an accounting.  Cases

consolidated. Partial summary judgments in favor of plaintiff church in the first case and defendants in the second case. Defendants in the first case and plaintiffs in the second case appeal. Vacated.

*Arthur J. Hass,* for appellees.

*McClintock, Fulton, Donovan & Waterman* (*Thomas A. Roach,* of counsel), for appellants George Nicoloff, Gilbert Kurop, Paul G. Kostoff, Nick Thomas, George K. Panzoff, and Jordan Tanasoff.

Before: HOLBROOK, P. J., and McGREGOR and BRONSON, JJ.

BRONSON, J. This is an appeal from summary judgments granted in the Wayne County Circuit Court.

On appeal two cases were consolidated. In one the Macedono-Bulgarian Orthodox Church Saint Clement Ohridski, a subordinate hierarchical church, seeks to restrain its former priest, George Nicoloff, from attempting to conduct services in the premises allegedly owned by the church, and to restrain him from using any of the church's real or personal property; and for an accounting. The complaint alleges that Nicoloff was defrocked by the church because he participated in a schismatic creation of a new hierarchy.

The second action, consolidated on appeal, was instituted by followers of Father Nicoloff against the Yovan faction of the church (so named for the president of the church), seeking a receiver, an accounting, and a determination of the proper governmental body of the temporal affairs of the church. From summary judgments in favor of plaintiff church in

the first case and for the defendants in the second case, this appeal is taken.

In 1938, the Holy Synod of the Bulgarian Eastern Orthodox Church, which is situated in Sofia, Bulgaria, established the Diocese of America, North and South, and Australia. Bishop Andrey was appointed head of that diocese. Both parties agree that as of 1938, when the diocese was formed, the hierarchical structure consisted of: (1) The Holy Synod, (2) The Diocese of America, North and South, and Australia, and (3) Macedono-Bulgarian Orthodox Church Saint Clement Ohridski (hereinafter referred to as the church), in that order.

In 1947, fearing the influence of a communist regime in Bulgaria upon the Holy Synod, Bishop Andrey, Father Nicoloff and others formed a "new" diocese. This new diocese was incorporated in New York, with Bishop Andrey as its bishop. The certificate of incorporation provides in part:

"Resolved, that the Bulgarian Eastern Orthodox Church; Diocese of America, North and South, and Australia, shall become a corporation pursuant to § 15 of the Religious Corporation Law of the State of New York under the name of

Bulgarian Eastern Orthodox Church;
Diocese of America, North and South,
and Australia,

as the governing body of our dioceses, bishoprics, churches, missions, parishes, congregations, societies and committees in the Americas and all the territorial possessions and/or dependencies or protectorates of the United States, of Canada, of Australia and of the South American republics, under the spiritual jurisdiction of the Holy Synod of Bulgaria, exercised by its duly authorized exarch, metropolitan, archbishop or bishop.

"The purposes of this religious corporation are:

"(a) To exercise governing and advisory authority over the subdivisions of its own jurisdiction;

"(b) To maintain spiritual unity, coordinate re-religious work or activity, and promote collaboration and closer relations with the governing and advisory bodies of other Eastern Orthodox Catholic jurisdictions in said territory with the intent of propagating, practicing and forever perpetuating the religious worship, services, ministrations, sacraments and teachings in full accordance and unity with the doctrine, ritual, canon law, faith, practice, discipline, traditions and usages of the Eastern Orthodox Church.

"(c) That the canonical exarch or metropolitan or archbishop or bishop, who is the duly authorized ecclesiastical administrator of said diocese, shall be the presiding officer and president of this corporation irrevocably."

This creation of a "new" diocese which, while under the spiritual jurisdiction of the Holy Synod of Bulgaria, was, according to the articles of incorporation, "to exercise governing and advisory authority over the subdivisions of its own jurisdiction", was viewed by the Holy Synod with disfavor; and in response the Holy Synod removed Bishop Andrey as head of the diocese. However, as the articles of incorporation stated that:

"(d) The term of office of His Grace Andrey Velichky, incumbent bishop and ecclesiastical administrator, shall be for life and his successors in said office shall be appointed by the Holy Synod of Bulgaria and shall qualify as such provided that each successor is elected as such at a stated or at a special convention of the diocese."

the action of the Holy Synod was ignored.

For the next 15 years the incorporated diocese acted as a seemingly independent diocese, and Macedono-Bulgarian Orthodox Church Saint Clement Ohridski operated as a church within this framework. It is the claim of the appellants that as of

1947 the hierarchical structure to which the local church adhered was: (1) the "new" diocese, and (2) the church.

At a date some 15 years after the incorporation Bishop Andrey determined, on his own authority, to return to the administrative control of the Holy Synod in Bulgaria. When the various member churches of the diocese learned of Bishop Andrey's actions, a special church conference was called. At this conference, held in Detroit on March 25, 1963, it was determined that Bishop Andrey's actions were contrary to the constitution of the diocese and to the decision of the Diocesan Sobor (constituent assembly) held in 1947.

This decision of the 1963 conference created a second rift in the church resulting in two factions, one group, the Yovan faction, following the dictates of Bishop Andrey and the other group, the Nicoloff faction, following the dictates of the special conference. The Nicoloff faction then sought the protection of the Russian Orthodox Church Outside of Russia, renouncing their allegiance to Bishop Andrey. The underlying reason for the conflict was the alleged domination of the Bulgarian Eastern Orthodox Church by the Communist Party.

The special conference held in 1963 determined that Archimandrite Kyrill who had been assistant to Bishop Andrey, would become the administrative head of the diocese. The conference further determined that, as they were now effectively without a Bishop, the diocese should seek the protection of the Russian Orthodox Church Outside of Russia, and that the Russian Orthodox Church Outside of Russia ordain Archimandrite Kyrill as a bishop of the Bulgarian Eastern Orthodox faith.

In 1964, Bishop Andrey instituted proceedings to defrock Father Nicoloff as a priest. Father Nicoloff

countered that as Bishop Andrey had departed from
the then true diocese he had no authority or ju-
risdiction over Father Nicoloff or his church.

Since about 1935 the church has occupied and used
a building situated on 25th Street in Detroit.  The
premises were originally owned by the Macedonian
Political Organization, which was later incorporated
under the name of the Macedonian Patriotic Organi-
zation.

Before this present dispute the church also had
acquired property on Ford Road in Dearborn where
it had commenced building a new church.  In early
1965 this factional dispute erupted at the church's
annual meeting.  Since that time, pending the out-
come of this litigation, and pursuant to an agree-
ment made in open court, the Nicoloff faction has
continued to worship in and use the church on 25th
Street while the Yovan faction has continued to wor-
ship in and use the church on Ford Road.

Under the facts here presented, in order to reach
a decision as to who owned or has a right to cer-
tain properties, this Court would have to delve into
areas presently forbidden to the civil courts.  In
this regard we are controlled by *Presbyterian
Church in the United States* v. *Mary Elizabeth Blue
Hull Memorial Presbyterian Church* (1969), 393 US
440 (89 S Ct 601, 21 L Ed 2d 658), and by *Berkaw*
v. *Mayflower Congregational Church* (1969), 18 Mich
App 245.

When, in 1947, the "new" diocese was formed there
appears to have been no dissent amongst the fol-
lowers of Bishop Andrey and Father Nicoloff.  Al-
though the Holy Synod disapproved of this incor-
poration and removed Bishop Andrey, he neverthe-
less continued to act as bishop for the "new" diocese.
Some 15 years later Bishop Andrey, after effecting
a rapprochement with the Holy Synod, seemingly

had Father Nicoloff defrocked. Thus, we cannot help but observe that we are being asked to consider two apparent schisms.

In order to resolve property rights this Court would have to determine the effect of the 1947 action, the power of the Russian Orthodox Church Outside of Russia to ordain a bishop in the Bulgarian Eastern Orthodox faith,* and whether the Andrey faction or the Nicoloff faction represented the faithful minority, at the time of the dispute in 1963. As the Supreme Court of the United States stated in *Mary Elizabeth:*

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of

---

* This case is to be distinguished from *Hanna* v. *Malick* (1923), 223 Mich 100, where ordination of a Syrian Orthodox priest was performed by a Russian Orthodox bishop since in *Hanna* the rite was performed at the request of the Patriarch of Antioch whereas in the present case the ordination of Bishop Kyrill was in direct opposition to the desires of the Holy Synod in Sofia.

government for essentially religious **purposes,**
*School District of Abington* v. *Schempp* (1963), 374
US 203 (83 S Ct 1560, 10 L Ed 2d 844); the Amend-
ment therefore commands civil courts to decide
church property disputes without resolving underly-
ing controversies over religious doctrine.   Hence,
states, religious organizations and individuals must
structure relationships involving church property so
as not to require the civil courts to resolve ecclesi-
astical questions."

The *Mary Elizabeth* case involved:

"[A] church property dispute which arose when
two local churches withdrew from a hierarchical
general church organization.   *   *   *   The question
presented is whether the restraints of the First
Amendment, as applied to the states through the
Fourteenth Amendment, permit a civil court to
award church property on the basis of the interpre-
tation and significance the civil court assigns to
aspects of church doctrine."

And, while noting that:

"It is of course true that the state has a legitimate
interest in resolving property disputes, and that a
civil court is a proper forum for that resolution.
Special problems arise, however, when these dis-
putes implicate controversies over church doctrine
and practice",

the United States Supreme Court found that:

"The *Watson* Court refused, pointing out that it
was wholly inconsistent with the American concept
of the relationship between church and state to per-
mit civil courts to determine ecclesiastical questions.
In language which has a clear constitutional ring,
the Court said
" 'In this country the full and free right to enter-
tain any religious belief, to practice any religious

principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect * * * . All who unite themselves to such a body (the general church) do so with an implied consent to (its) government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them [*sic*] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.' 80 US (13 Wall), at pp 728, 729 (20 L Ed at pp 676, 677).
The logic of this language leaves the civil courts *no* role in determining ecclesiastical questions in the process of resolving property disputes."

As this Court noted in *Berkaw* v. *Mayflower Congregational Church* (1969), 18 Mich App 245:

"The Supreme Court (in the *Mary Elizabeth* case) reversed the Georgia jury verdict granting church property to the local churches based upon a finding of fundamental abandonment of the original doctrines by the general church. * * *

"We consider the *Mary Elizabeth* decision to be controlling in the instant case. The fundamental inquiry in this case was whether the majority, by voting to become a part of the United Church of Christ, departed from Congregational doctrine. Clearly, therefore, in order to grant the relief plaintiffs request, ecclesiastical issues regarding departure from doctrine must be resolved by civil courts.

Such a determination was expressly prohibited by *Mary Elizabeth:*

" 'The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied requires the civil judiciary to determine whether actions of the general church constitute such a 'substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. This determination has two parts. The civil court must first decide whether the challenged actions of the general church depart substantially from prior doctrine. In reaching such a decision, the court must of necessity make its own interpretation of the meaning of church doctrines. If the court should decide that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role.' "

Although we agree with Judge FITZGERALD's observation in his concurrence in *Berkaw, supra:*

"I cannot refrain from briefly observing that strict application of the *Mary Elizabeth* case catapults us to the ultimate irony that churches have been divorced from any statutory protections, from fostering influences furnished by state legislatures, and

from all the benefits of law save perhaps those 'marginal' few cited in *Gonzales.*"

it is our opinion that under the ruling in the *Mary Elizabeth* and *Berkaw* cases we are prevented from deciding the questions here presented. Accordingly, the lower court decisions are vacated.

McGREGOR, J., concurred.

HOLBROOK, P. J. (*dissenting*).

After carefully considering the majority opinion of my brothers in this difficult and important case I find myself in disagreement with their decision. The facts of the case are clearly set forth in the learned trial judge's rulings. Although the court rendered partial summary judgments, the court did, before its determination, consider all the pleadings, depositions and took considerable testimony in the cases.

Supplemental facts which are helpful in understanding better the circumstances surrounding this controversy are added *viz.*: a portion of the subject property, located at 2950 25th Street in the city of Detroit, which is presently being occupied by the church's former priest, George Nicoloff, a defendant herein, was, from 1938, owned by the defendant Macedonian Political Organization Fatherland which, in that year, became a non-profit corporation. In July, 1957, the organization changed its name to Macedonian Patriotic Organization Fatherland. The plaintiff, Macedono-Bulgarian Orthodox Church St. Clement Ohridski (hereinafter referred to as St. Clement Ohridski) was organized as a voluntary association in 1935 as evidenced by the Statutes of the Macedonian-Bulgarian Orthodox Parish St. Clement Ohridski which provided in part as follows:

"Article 1. The Bulgarian immigrants from Bulgaria, Macedonia, and from wherever else they may have been born, but who live in Detroit and its environs, and who according to their Christian belief belong to the Holy Bulgarian Orthodox Church, organized on February 17, 1935, a Macedonian-Bulgarian Orthodox parish, under the name of St. Clement Ohridski.

"Article 2. This parish, in its spiritual relationship, exists under the administration of the Bulgarian Exarchate and recognizes as its ecclesiastical guide and authority the Holy Synod of the Bulgarian Orthodox Church, at whatever place this Holy Synod may be found.

"Article 3. The principal aim of this ecclesiastical parish is to satisfy the religious and spiritual needs of its parishioners and to promote spiritual and religious activity, which will be in full harmony with the canons, bylaws, and the traditions of the Holy Bulgarian Orthodox Church.

"Article 4. The statutes of the exarchate, the regulations, the circular letters of the Holy Synod, the present statutes and the bylaws worked out in the spirit of these statutes and as their supplement will be the lawful rules for the discipline and internal life of this church parish."

These statutes have never been changed. In May, 1960, plaintiff church with defendant George Nicoloff as priest thereof, was incorporated as a Michigan nonprofit ecclesiastical corporation. The Macedonian Patriotic Organization Fatherland, by warranty deed, conveyed title to the 25th Street property to St. Clement Ohridski, on April 6, 1961, reserving unto itself certain rights to the premises.

The amended complaint of the plaintiff alleged that: (a) St. Clement Ohridski is a qualified ecclesiastical corporation incorporated under the laws of the State of Michigan whose articles of associa-

tion filed May 24, 1960, were subscribed to by George
Nicoloff and state in part: .

"The members of said church agree to worship
and labor together according to the discipline, rules
and usage of the Archdiocese of the Bulgarian East-
ern Orthodox Church in the U. S. A. as from time
to time authorized and declared by the Holy Synod
of the Bulgarian Eastern Orthodox Church * * * ."

(b) The Bulgarian Eastern Orthodox Church, Dio-
cese of America, North and South, and Australia,
was constituted by the Holy Synod of the Bulgarian
Church on December 31, 1937, and on the 27th day
of June, 1947, it was incorporated as a church corpo-
ration in the State of New York and at the time of
its incorporation, the defendant, George Nicoloff,
was a trustee thereof.

The defendant answered: (a) The new charter
of 1960 is admitted as alleged, with an assertion that
the charter should have included other wordage;
(b) that the original articles of incorporation in
1935 [sic] provided that the church or society "shall
worship and labor together according to the disci-
pline, rules and usage of the Archdiocese of the
Bulgarian Eastern Orthodox Church in the United
States of America as from time to time authorized
and declared by the Holy Synod of the Bulgarian
Eastern Orthodox Church," and, further, admitted
the incorporation of 1947 but asserted that it had
the effect of reconstituting the plaintiff and the
other churches involved, free of any administrative
control of the Holy Synod.

Plaintiff, St. Clement Ohridski, also alleged in its
complaint that in 1963 defendant George Nicoloff,
and others, attempted to create a new Bulgarian
Orthodox Diocese in the United States, headed by
Bishop Kyrill Yonchev, which diocese was not au-
thorized by the Holy Bulgarian Eastern Orthodox

Church nor by the Ecumenical Patriarch at Constantinople; that defendant Nicoloff, aided by the defendant Macedonian Patriotic Organization, has, through the diversion of church property to the new diocese, attempted to cause plaintiff church to secede from the Holy Synod's duly constituted Diocese of America, North and South, and Australia and to become associated with the new diocese of defendant Nicoloff, a diocese fundamentally opposed to the faith, doctrines, customs, usages and discipline of the Mother Church in Bulgaria. Plaintiff church further alleged that the Diocese of America, North and South, and Australia is the only diocese having jurisdiction over the plaintiff church with the approval of the Holy Synod of the Bulgarian Eastern Orthodox Church and that the property of plaintiff church is and continually has been dedicated to the use of the faithful members of the Holy Synod of the Bulgarian Eastern Orthodox Church.

The following testimony of defendant Nicoloff and Gilbert Kurop, a follower of defendant Nicoloff, clearly indicates that the schism within plaintiff church developed in 1963, after the claimed defrockment of defendant Nicoloff by Bishop Andrey, at which time defendant Nicoloff attempted to form a new diocese independent of the Bulgarian Holy Synod.

In his deposition of September 28 and 29, 1966, defendant Nicoloff stated as follows:

"*A.* In 1963 we separated parishes and clergy from the authority of the ecclesiastical authority of Bishop Andrey.

"*Q.* And did this new organization that separated, as you say, receive the sanction of the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* Not of the Holy Synod of the Bulgarian Eastern Orthodox Church, because we never asked for

that. But we received the sanction of the Holy
Synod of the Russian Orthodox Church Outside
Russia here in the United States.

"*Q.* I see. So that the way you have this now,
your present diocese has no connection whatsoever—

"*A.* With the—

"*Q.* —with the Holy Synod of the Bulgarian East-
ern Orthodox Church?

"*A.* We have no administrative connection with
the Holy Synod of the Bulgarian Eastern Orthodox
Church, but spiritually we are the Bulgarian Eastern
Orthodox Church.

\*    \*    \*

"*Q.* Do you regard yourself now under the juris-
diction of the Holy Synod of the Bulgarian Eastern
Orthodox Church?

"*A.* No.

\*    \*    \*

"*Q.* When was the authority of the Holy Synod
renounced?

"*A.* We never renounced the authority of the Holy
Synod in the spiritual meaning of that word. We
denounced—we decided only that from this date we
were not going to have administrative orders from
the Holy Synod on account of the fact that the Holy
Synod of the Bulgarian church is not free; it is
under the pressure of the communistic government.

"*Q.* I see. That was in 1963?

"*A.* Correct.

"*Q.* Well, was there any time at all that the juris-
diction of the Holy Synod over you was renounced?

"*A.* The jurisdiction of the Holy Synod over me
was denounced when I received information from
Bishop Andrey that the so-called defrocking had
been approved by the Holy Synod.

"*Q.* I see. You renounced your allegiance to the
Holy Synod; is that correct?

"*A.* Correct.

"*Q.* And as of today that renunciation still stands?

"*A.* Yes."

In the deposition of Gilbert Kurop it was stipulated that his testimony would be binding upon the other deponents aligned with the Nicoloff faction. The following appears therein:

"*Q.* Do you recognize that the Holy Synod of the Bulgarian Orthodox Church is one of the autocephalic divisions of the Ecumenical Council of the Eastern Orthodox Church?

"*A.* I do not recognize the Holy Synod in its ecclesiastical function.

\*　\*　\*

"*Q.* Will you give me the hierarchy of that church to which you are now associated.

"*A.* In religious order it would be parishioner, protospirit, deacon, priest, bishop, Christ.

\*　\*　\*

"*Q.* Does the man you call George Nicoloff—Reverend George Nicoloff—agree that the man you call Bishop Yonchev has no superior?

"*A.* Yes.

"*Q.* So that, ecclesiastically, your group had now formed a church in a diocese which is completely separated, ecclesiastically, from the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* That is correct."

The certificate of incorporation of the Bulgarian Eastern Orthodox Church, diocese of America, North and South, and Australia, dated June 27, 1947, stated in part:

"(d) *The term of office of His Grace Andrey Velichky, incumbent bishop and ecclesiastical administrator, shall be for life and his successors in said office shall be appointed by the Holy Synod of Bulgaria and shall qualify as such provided that each successor is elected as such at a stated or at a special convention of the diocese.*" (Emphasis supplied.)

Bishop Andrey of the Holy Synod of the Bulgarian Eastern Orthodox Church, Sofia, Bulgaria, was ap-

pointed head of the Diocese of America, North and South, and Australia, in 1938, when that diocese was created by the Holy Synod.   In 1947 when the diocese was incorporated under the laws of the State of New York he was named as the bishop of that diocese in the articles of incorporation.   It is undisputed that he was the bishop to whom plaintiff church declared allegiance at all times pertinent to the suits.   Bishop Andrey was the bishop of the diocese in question at the time of the disagreement with Father Nicoloff in 1963 as well as at the time when these matters were before the court for determination.

The trial court's opinion, granting partial summary judgment to the plaintiff church on the amended complaint, stated:

"Briefly stated, the facts, for the purposes of this motion for summary judgment, as gleaned from the pleadings, depositions and pre-trial statements appear as follows:

"The Macedeno-Bulgarian Orthodox Church is a Michigan ecclesiastical nonprofit corporation affiliated with the hierarchical structure of the Bulgarian Orthodox Church, having its Holy Synod in Bulgaria.

"Bulgaria, prior to the facts here in question, fell under Russian domination and was subject to the political domination of the Communist Party.  There are allegations that this domination has been extended to the hierarchical structure of the Bulgarian Orthodox Church.

"At the instance of Bishop Andrey procedures were set in motion which culminated in the defrockment of Father George Nicoloff.  This was confirmed by the hierarchy in Bulgaria on or before December 4, 1964.

"Father Nicoloff refused to recognize the actions of Bishop Andrey or the hierarchy in Bulgaria, al-

leging that they were under control of the political powers of a foreign government.

"Further, that Father Nicoloff, at the time of the defrockment, was in fact duly ordained as a priest of the Russian Orthodox Church Outside Russia—thus was outside the jurisdiction of Bishop Andrey at the time of defrockment.

"Father Nicoloff has continued on in the church property owned by the Macedono-Bulgarian Orthodox Church during the course of this controversy under a directive of the Honorable James Montante, wherein the status quo of the parties would be maintained in this regard.

"A very serious question, with far-reaching ramifications, is presented at the outset of our discussions; namely, the defrockment of Father Nicoloff, and the right of the court to inquire into the ecclesiastical decision determining this defrockment.

"The free exercise of religious beliefs, unhampered by judicial, or legislative, interference is fundamental in our basic concept of constitutional government. The interference with ecclesiastical decision and the abhorrence of such interference very early gave birth to the basic concept of separation of church and state.

"It goes without saying that to meddle with religious concepts that have withstood the ravages of centuries, and ecclesiastical actions based thereon, because of the vicissitudes of current political influence on some individuals, if such exists, would destroy all religious concepts and create total and utter confusion in all religions of widespread acceptance.

"The United States Supreme Court, in *Kedroff* v. *Saint Nicholas Cathedral of the Russian Orthodox Church in North America* (1952), 344 US 94, 114 (73 S Ct 143, 153; 97 L Ed 120, 135), quoting from *Watson* v. *Jones* (1872), 80 US (13 Wall) 679 (20 L Ed 666), states so aptly and succinctly:

" 'In this country the full and free right to entertain any religious belief, to practice any religious princi-

ple, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who invite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.'

"This controversy involves a question of discipline and ecclesiastical rule or law, and is, truly speaking, a matter of ecclesiastical government. The question of defrockment is not a matter for the civil courts.

"There can be no question that prior to the take over of Bulgaria by the Russians the procedures followed leading up to the defrockment of Father Nicoloff would not have been subject to scrutiny by civil courts. There is none now.

"There is no question here regarding the use of churches for subversive purposes. Any acts of subversion would be treated under and pursuant to laws and regulations designed for that purpose. This court does not recognize any ecclesiastical immunity in the case of subversive acts, nor would it tolerate the distortion of ecclesiastical law for that purpose.

However, this is not the question before the court. See *Kedroff* v. *Saint Nicholas Cathedral of the Russian Orthodox Church in North America, supra*.

"It is not necessary that this court rely on the fact of defrockment in determining the disposition of church property presently held by Father Nicoloff.

"Father Nicoloff is a priest of the Russian Orthodox Church Outside of Russia. The choice of religious affiliation was his to be exercised as he desired.

"The Michigan Supreme Court, in *Immanuel Evangelical Lutheran Church* v. *Fromm* (1962), 367 Mich 575, 588, quoting from *Fuchs* v. *Meisel* (1894), 102 Mich 357 (32 LRA 92), states in part: 'In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who choose to remain in the church, and who represent the regular church organization.'

"It is thus the opinion of this court that Father Nicoloff's defrockment was a matter of ecclesiastical decision outside the area of civil court jurisdiction; and, further, that Father Nicoloff, being thus defrocked and/or, in any event, having voluntarily left the plaintiff, Macedono-Bulgarian Orthodox Church for the Russian Orthodox Church Outside of Russia, must surrender any and all properties in his possession to said plaintiff church.

"Those questions pertaining to the Macedonian Patriotic Organization Fatherland present certain questions of fact; therefore must await a hearing on the merits.

"This court thus grants partial summary judgment to plaintiff on the amended complaint.

"1. That defendant George Nicoloff be required to account for properties in his possession or coming

into his possession on behalf of the plaintiff church
subsequent to his last accounting, and that said
properties be turned over to plaintiff church.
"2. That defendant George Nicoloff be restrained
permanently from attempting to conduct any serv-
ices in or on the premises owned by the plaintiff
church, and from using any of the church's real or
personal property unless and until such time as he
be reinstated with plaintiff church.

"A further question has been raised in Suit No.
44030, and by order of court at pre-trial was consoli-
dated with the original case involving the Macedono-
Bulgarian Orthodox Church.

"This question appears as follows: What persons
are entitled to membership in the Macedono-Bulgari-
an Orthodox Church, pursuant to requirements set
forth in the statutes of the church?

"It would appear to the court that this question
when answered is decisive of the additional question
of who is entitled to hold office.

"The statutes of the Macedono-Bulgarian Ortho-
dox Parish Saint Clement Ohridski spell out spe-
cifically and unequivocally the requirements for
membership. The court refers more specifically to
Articles 1, 6, 7, 8, 9 and 10.

"It is this court's opinion that the trial of the
issues in the instant case be restricted to proofs re-
garding the ineligibility of or eligibility of individu-
als to membership in the Macedono-Bulgarian Ortho-
dox Parish pursuant to the provisions of the articles
hereinbefore mentioned."

In its opinion denying the motion for rehearing
filed by defendant Nicoloff in the first case, and
plaintiff Kurop, *et al.,* in the second case, the trial
court stated as follows:

"This matter comes on for decision by way of
motion for rehearing sought by defendant George
Nicoloff, (Case No. 44030), and plaintiff Gilbert
Kurop, et al., (Case No. 64477), wherein defendant

(44030) and plaintiff (64477) seek to set aside certain summary judgments heretofore entered.

"This court has again reexamined all the *pleadings, depositions* and *evidence* in the instant case. The court has also reviewed its notes of arguments advanced by counsel.

"The Macedono-Bulgarian Orthodox Church is a Michigan ecclesiastical nonprofit corporation affiliated with the hierarchical structure of the Bulgarian Orthodox Church, having its Holy Synod in Bulgaria.

"The statutes of the Bulgarian Orthodox Church specifically state and recognize the hierarchical structure of the church having its Holy Synod in Bulgaria.

"The articles of incorporation of the Macedono-Bulgarian Orthodox Church Saint Clement Ohridski, a Michigan ecclesiastical nonprofit corporation, specifically state and recognize the hierarchical structure of the church having its Holy Synod in Bulgaria.

"The mere statement by Father Nicoloff or any other does not and will not change the hierarchical structure of the Bulgarian Orthodox Church nor the fact that the Holy Synod is in Bulgaria.

"Father Nicoloff became a priest in the Macedono-Bulgarian Orthodox Church in 1935. This is the same church which by church statute is hierarchical in structure with its Holy Synod in Bulgaria.

"Father Nicoloff acknowledges in his deposition under oath that Bishop Andrey set in motion procedures which culminated in the defrockment of himself; that this was confirmed by the hierarchy in Bulgaria some time on or before December 4, 1964; that Bishop Andrey was the bishop in the United States of the Bulgarian Eastern Orthodox Church; that Bishop Andrey at the time of the defendant's defrocking was in good standing with the Holy Synod.

"Defendant's position bears a remarkable resemblance to that proverbial act of having one's cake

and eating it also. The defendant when speaking of defrockment or church property looks upon his church as congregational in structure; when speaking canonically the defendant acknowledges the reality of a hierarchical structure with its Holy Synod in Bulgaria.

"The question of defrockment was, as defendant Nicoloff has stated in his deposition, determined by ecclesiastical law. The defendant chose not to appeal according to procedures provided for appeals. This court neither approves nor disapproves what took place, but does accept the accomplished fact.

"As this court stated in its prior opinion:

" 'The free exercise of religious beliefs, unhampered by judicial, or legislative, interference is fundamental in our basic concept of constitutional government. The interference with ecclesiastical decision and the abhorrence of such interference very early gave birth to the basic concept of separation of church and state.

" 'It goes without saying that to meddle with religious concepts that have withstood the ravage of centuries, and ecclesiastical actions based thereon, because of the vicissitudes of current political influence on some individuals, if such exists, would destroy all religious concepts and create total and utter confusion in all religions of wide-spread acceptance.

" 'This controversy involves a question of discipline and ecclesiastical rule or law, and is, truly speaking, a matter of ecclesiastical government. The question of defrockment is not a matter for the civil courts.'

"It is interesting to note that counsel for defendant Nicoloff on more than one occasion argued most vociferously that Bishop Andrey could not defrock Father Nicoloff for the reason that the Father was in fact a priest in the Russian Orthodox Church Outside of Russia at the time of the alleged defrockment; therefore he was not subject to Bishop

Andrey's decree. I assume from defendant Nicoloff's present position that he has abandoned this interpretation of the evidence.

"The question of whether or not Father Nicoloff was ordained as a priest of the Russian Orthodox Church Outside of Russia this court feels is of little moment. The point was raised by the court because it had been advanced by Father Nicoloff's counsel in vigorous argument. The main thrust of the court's opinion was based upon the fact of defrockment heretofore treated. The ordination in another church as previously advanced, if such had existed, neither added nor detracted from the prior conclusions.

"In the second case the plaintiffs Kurop, *et al.* (Case No. 64477), alleged that the defendants did fail to comply with the church statutes in certain respects.

"Testimony was offered at the commencement of the trial on Case No. 64477. A witness was being cross-examined regarding bylaws of defendant nonprofit ecclesiastical corporation. The witness, Mr. Yovan, a defendant, was asked to identify the church statutes as the bylaws of defendant corporation. This the witness denied.

"The court then determined that if plaintiff relied upon the church statutes to be the corporate bylaws, and such was not in fact true, the case had reached a critical point and proceeded to take testimony based upon this issue.

"The testimony showed and this court so found that the church statutes were in fact just that, and were designed and used for the purpose of guiding the ecclesiastical operations of the church. The church statutes dealt with ecclesiastical matters. The court further found no credible evidence that these statutes were used or intended for use as bylaws for the defendant corporation. Further, as plaintiffs now appear to concede, the corporation had never adopted bylaws.

"Plaintiffs Kurop, *et al.,* denounce, pursuant to deposition statements, the hierarchical structure of the Macedono-Bulgarian Orthodox Church (at this point plaintiffs seem to adopt a congregational structure).

"The posture of the second case (No. 64477) thus was one wherein the plaintiffs were attempting to raise questions regarding church property held as it is in the defendant ecclesiastical corporation established by the church. The defendant's corporate charter and the church statutes specifically recognize and state that the Macedono-Bulgarian Orthodox Church is in fact a hierarchical structure with its Holy Synod in Bulgaria. The plaintiffs renounce and deny affiliation with the very church whose property they question. By the plaintiffs' own deposition they renounce any interest in the property, and are not proper party plaintiffs.

"Further, all allegations in the second suit, according to pleadings, arise by virtue of church statute as distinguished from corporate bylaws, there being no bylaws. The church statutes dealt with ecclesiastical matters as distinguished from corporate matters.

"The plaintiffs thus desired this court to interpret matters purely and simply ecclesiastical and apply them to the defendant corporation. An example of this was the very question asked of witness Yovan, wherein reference was made to the statutory (church) provisions regarding baptism.

"To allow questions regarding the validity of baptism within the Macedono-Bulgarian Orthodox Church would have placed the civil courts squarely in the middle of a determination of church doctrine, its interpretation and application on the most important ecclesiastical question of baptism.

"This court therefore concluded that the plaintiffs were not in fact proper parties to bring the lawsuit, and, further, that while the complaint (64477) alleges that defendants did certain acts in relation to the church statutes which deal with the ecclesi-

astical matters, no mention was made of any acts in
relation to corporate bylaws, which plaintiffs' proofs
on hearing showed were nonexisting. The court thus
refused to entertain ecclesiastical matters."

The records in these causes supporting the deci-
sion arrived at by the trial court, as they do, the
trial court's opinions as hereinabove set forth are
adopted.

The rights as between two contending factions to
possess, occupy and use the church property pursu-
ant to the church's articles of incorporation, (or
association), was considered in the analogous case
of *Hanna* v. *Malick* (1923), 223 Mich 100. That case
involved opposing factions in an incorporated reli-
gious association of members of the Greek Orthodox
faith. The purpose of the corporation's organiza-
tion, as stated in its articles of association, was that
of promulgating the Christian religion according to
the tenets, doctrines and creed of the Syrian Greek
Orthodox Church of Antioch, Syria, and the Syrian
Greek Orthodox Church of America, as expounded
by the Bishop of Brooklyn, New York. The schism
in the local St. George's First Syrian Greek Ortho-
dox Church developed when the local priest re-
quested his congregation to declare, in writing, their
loyalty to a Russian bishop who had been nominated
by priests of the Syrian Greek Orthodox faith. The
plaintiffs refused to subscribe to the declaration of
loyalty, also refusing to allow their local priest to
mention the name of a Russian bishop as his highest
church authority. Plaintiffs insisted that the priest
mention the name of the Patriarch of Antioch, the
Mother Church, as his highest authority, pending
appointment of a Syrian bishop as Bishop of Brook-
lyn. Members of the local church who were willing
to subscribe to the writing attempted to amend the
articles of association of the local church by placing

the church property and service in the name, and under the immediate control, of the Russian Holy Synod.  As in the instant cases under consideration, a break with the Mother Church was attempted, with a consequent division of the local church into two factions.  In *Hanna,* just as in the cases at hand, the plaintiffs, members of the regular church organization, claimed that they were ousted from their alleged just and rightful use of the church property by the dissident faction.  Our Supreme Court in *Hanna* was called upon to determine, as this Court must likewise determine, to which faction the church property rightfully belonged.  Resolution of this question does not necessitate a decision upon matters of an ecclesiastical nature, which are not within the jurisdiction of the civil courts to declare.  *United Armenian Brethren Evangelical Church* v. *Kazanjian* (1948), 322 Mich 651; *Davis* v. *Scher* (1959), 356 Mich 291; and *Berkaw* v. *Mayflower Congregational Church* (1969), 18 Mich App 245.

The Supreme Court in *Hanna, supra,* adopted with approval the opinion of the trial court which granted the church property to plaintiffs, representatives of the regular church organization.  The Court, quoting from the trial court opinion, stated at p 118:

" 'The attempt of the defendants to amend the articles of association and bylaws as originally drafted, so as to place the supervision, control and instructions of this local church and the church property herein described within the ownership and under the direction and authority of the Holy Synod of Russia, was unwarranted and illegal and of no force or avail.

" 'The court concludes that the plaintiffs have been illegally deprived of the possession and control of the church property and premises in question; plaintiffs have maintained the allegations of their

bill, and they represent the regular church organization. This opinion makes no decision as to ecclesiastical authority or conflict of authority of different branches of the Greek Orthodox Church within the United States.' "

The Court further stated at pp 118, 119:

"Plaintiffs are evidently moved to this controversy by a religious sentiment involving community of race, language and reverence for the ancient church as organized in the land of their nativity, * * * . The purpose and intention of the original incorporators to legally stamp with those distinctions this church of their faith organized by them in the land of their adoption is plainly declared in their corporate articles of association and repeated in the bylaws. They acquired and consecrated to that particular purpose the property in controversy here. * * *

"Those who thus organized this Syrian ecclesiastical society, acquired the property in question for the purposes of the organization and thereafter adhered to that declaration of faith and recognized jurisdiction are entitled to the possession, control and use for such purposes of the property so acquired as against those seeking to divert its use and control to the jurisdiction of a Holy Russian Synod or patriarch."

In *Davis* v. *Scher, supra,* the Court stated at p 298:

"The Michigan Supreme Court has held on numerous occasions that the membership of a congregation, which is one of several congregations belonging to a particular religious faith to which the local church property and practice is dedicated, does not have the right to effect, by vote of a momentary majority, a change in religious practice, not conformable with the origin and historic character of the faith of the church of which the local congrega-

tion is one member, as against those who faithfully adhere to the characteristic doctrine of the church, and thereby deprive the minority of the use of the church property.

"The weight of authority in Michigan is to the effect that the majority faction of a local congregation or society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust."

See, also, *Fuchs* v. *Meisel* (1894), 102 Mich 357 (32 LRA 92); *Borgman* v. *Bultema* (1921), 213 Mich 684; *Michigan Congregational Conference* v. *United Church of Stanton* (1951), 330 Mich 561; *Second Protestant Reformed Church of Grand Rapids* v. *Blankespoor* (1957), 350 Mich 347; and *Immanuel Evangelical Lutheran Church* v. *Fromm* (1962), 367 Mich 575.

The Nicoloff faction construes the 1947 New York State incorporation of the Diocese of America, North and South, and Australia as effecting a departure of the church from the administrative control of the Holy Synod of the Bulgarian Eastern Orthodox Church. It is undisputed that the plaintiff church has always adhered to the tenets, doctrines, beliefs, ritual and teachings of the Mother Church in Bulgaria. The Nicoloff faction cannot legally maintain its position of departing from the control of the Holy Synod of the Bulgarian Eastern Orthodox Church in 1963 based upon their interpretation of the 1947 incorporation, for even if the 1947 incorporation attempted to accomplish what the Nicoloff faction claimed for it, the attempt could not be successful for it would be contrary to law. *Kedroff* v.

*Saint Nicholas Cathedral of the Russian Orthodox Church in North America* (1952), 344 US 94 (73 S Ct 143, 97 L Ed 120) and *Kreshik* v. *Saint Nicholas Cathedral of the Russian Orthodox Church of North America* (1960), 363 US 190 (80 S Ct 1037, 4 L Ed 2d 1140).

No error having been committed, the partial summary judgments of the trial court should, upon the basis of the foregoing authority, be affirmed.