WIETHOFF v ST VERONICA SCHOOL

1. CONTRACTS—PRIVATE SCHOOLS—RULES—PROMULGATION.

A policy resolution adopted at a parish board meeting limiting teachers to be employed at the parish school to practicing Catholics was not "promulgated" as required by the school's contract with a lay teacher where the resolution was in the form of minutes typed by a recorder, kept at the home of the parish board secretary for a year, and then kept at the school principal's office; therefore, the regulation could not in law bind the lay teacher, and could not be a ground of breach of contract by her.

2. RELIGIOUS SOCIETIES — COURTS — JURISDICTION — ECCLESIASTICAL QUESTIONS — PROPERTY RIGHTS.

A civil court has no jurisdiction over ecclesiastical matters unless property rights are involved, and a contract right is a property right.

3. RELIGIOUS SOCIETIES — COURTS — JURISDICTION — ECCESIASTICAL QUESTIONS.

The question of the effect of "excommunication" as the term bears upon being a "practicing Catholic" is totally beyond the jurisdictional limitations of a civil court.

4. RELIGIOUS SOCIETIES — COURTS — JURISDICTION — ECCLESIASTICAL QUESTIONS.

Religious organizations and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

5. RELIGIOUS SOCIETIES—PROPERTY RIGHTS.

There is no distinction in law or logic which distinguishes "church property" from "individual property" rights.

Appeal from Macomb, Hunter D. Stair, J. Sub-

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts § 355.
[2–5] 66 Am Jur 2d, Religious Societies §§ 45–56.

mitted Division 2 April 5, 1973, at Lansing. (Docket No. 14597.) Decided June 27, 1973.

Complaint by Carol B. Wiethoff against St. Veronica School for breach of contract. Complaint dismissed with prejudice. Plaintiff appeals. Reversed and remanded for a hearing on the merits.

*Musilli, Meyers & Murphy,* for plaintiff.

*Clark, Klein, Winter, Parsons & Prewitt* (by *David P. Wood),* for defendant.

Before: McGREGOR, P. J., AND QUINN and O'HARA,* JJ.

O'HARA, J. This is a case in contract law. It is an action for breach of contract by a lay teacher in a Roman Catholic parochial school for $9,300. This sum she claimed is due her because she was not permitted to fulfill her teaching duties for the school year beginning September 3, 1970, and ending June 18, 1971. The contract specified that the teacher is required to observe the "general rules and regulations applicable to teachers in the Catholic schools of the Archdiocese of Detroit specified by the Archdiocesan School Board *as well as such special regulations as have been fixed and promulgated by the Parish Board of Education and the Principal of the school before signing of this contract".* (Emphasis supplied.)

It is this latter underlined proviso of the contract that plaintiff is claimed to have violated. The violation asserted is that she entered into marriage with a Roman Catholic priest. Though there is no specific reference to it in the record all parties to the litigation and the trial judge as-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

sumed (and apparently correctly so) that the in-volved priest was bound by a vow of celibacy and absent papal or other hierarchical dispensation unable to marry validly so far as the church is concerned.[1]

The exact special regulation claimed by the defendant parish school to have been violated was a resolution in the form of minutes of a parish board meeting. The witness who identified and testified to the authenticity of the minutes con-tended that the "policy" adopted at the meeting was to limit teachers to be employed at the school to "only Catholics and specifically to practicing Catholics". The date of adoption was June 3, 1969. The date of execution of the teaching contract is May 5, 1970.

It is noted carefully that the contract requires the teacher to abide by "such special [parish] regulations as have been fixed and *promulgated".* (Emphasis supplied.) The testimony as to "promul-gation" of the resolution is totally lacking. The testimony of the secretary-treasurer of the parish board of education was that the minutes of the meeting were typed by a recorder.[2] After this the secretary took them to her home where she kept them for a year, after which they were kept at the school principal's office.

Because litigation of this nature is of such fun-damental concern under the First Amendment to the Constitution of the United States what we hold here may be reviewed by our Supreme Court or possibly a Federal court of competent jurisdiction. Therefore we first hold decisionally that the reso-lution adopted by the parish board failed in law of

---

[1] There are priests in certain Roman Catholic rites who may per-missibly marry.

[2] This term used by the secretary of the parish board is unfamiliar to us. It is, however, a person other than the secretary herself.

promulgation as required by the teacher's contract. Thus the regulation could not in law bind plaintiff-appellant, and thus could not be a ground of breach of the contract by her.

We would do small service to the case law of the state by resting our decision on this ground alone. Therefore, we address ourselves to the fundamental question of the jurisdiction of the secular courts over matters of ecclesiastical doctrine.

It is the claim of the school that when plaintiff married a priest she became automatically excommunicated; that excommunication deprived her of the status of a "practicing Catholic" and thus she breached the contract by placing herself in a category which was excluded from those eligible to teach in the school under the contract.

Certain law in this field is settled and binding upon us. It is the law of Michigan, if not the law of the land, that a civil court has no jurisdiction over ecclesiastical matters unless property rights are involved, *Davis v Scher,* 356 Mich 291; 97 NW2d 137 (1959), and the authorities cited with approval therein. A contract right is a right in property. Thus upon first view it would seem that the issue here falls with the *Scher* exception.

But the final authority in this area is, of course, the United States Supreme Court. That Court has added a most important and indeed controlling caveat. We think it controls us here. We are not here dealing with which of two factions of a church is entitled to the title and thus use of a place of worship. We are not concerned simply with findings of fact and application of law to which of two or more factions deviated from a controlling doctrinal precept which was admittedly a part of the confession of the founding church.

In the case at bar all parties concede that the

appellant's marriage to the priest resulted in her excommunication. Both experts (Doctors of Sacred Theology) were agreed on that.[3] The question we are asked to decide is what is the effect of "excommunication", as that term bears upon being a (Roman) Catholic and particularly a "practicing Catholic". This is totally beyond our jurisdictional limitations. We think the controlling law is set forth in *Presbyterian Church in the United States v Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 US 440, 449; 89 S Ct 601, 606; 21 L Ed 2d 658, 665 (1969).

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentionally religious purposes, *Abington School District v Schempp,* 374 US 203 [83 S Ct 1560; 10 L Ed 2d 844] (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying

---

[3] If the parties want to agree to this it is none of our judicial business. We make clear, however, that we do *not* so hold decisionally.

controversies over religious doctrine. Hence, states, religious organizations and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Macedono-Bulgarian Orthodox Church Saint Clement Ohridski v Macedonian Patriotic Organization Fatherland,* 21 Mich App 281, 289–290; 175 NW2d 801, 805 (1970).

It is the last sentence in the foregoing quote we hold controls, that "religious organizations and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions".

We see no distinction in law or logic which distinguishes "church property" from "individual property" rights. Thus we hold here as did Judge BRONSON writing for the majority in *Macedono Church, supra,* that we have no role in determining the purely ecclesiastical, *i.e.,* doctrinal, question presented.

We reverse the holding of the trial judge granting defendant's motion for dismissal. We remand to the trial court for a hearing on the merits under plaintiff's complaint for breach of contract. Costs to the plaintiff-appellant.

All concurred.