DAVIS v. SCHER.

1. RELIGIOUS SOCIETIES — COURTS — JURISDICTION — ECCLESIASTICAL QUESTIONS—PROPERTY RIGHTS.
   A civil court has no jurisdiction over ecclesiastical questions unless property rights are involved.

2. SAME—COURTS—PRACTICE OF RELIGION.
   Civil courts do not have the right to interfere with the practice of religion in any way whatsoever.

3. SAME—COURTS—FREEDOM OF RELIGION.
   It is the duty of courts to preserve freedom of religion and its practice and to protect the rights of minority groups.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 3]  45 Am Jur, Religious Societies §§ 40, 41.
[4, 5, 6, 8]  45 Am Jur, Religious Societies § 55.
[7]  45 Am Jur, Religious Societies § 59.
[9, 10]  45 Am Jur, Religious Societies § 48.

4. SAME—CHANGE IN PRACTICE OF RELIGION—PROTECTION OF MINOR-
ITY.

> The membership of a congregation, which is one of several con-
> gregations belonging to a particular religious faith to which
> the local church property and practice is dedicated, does not
> have the right to effect, by vote of a momentary majority, a
> change in religious practice, not conformable with the origin
> and historic character of the faith of the church of which
> the local congregation is one member, as against those who
> faithfully adhere to the characteristic doctrine of the church,
> and thereby deprive the minority of the use of the church
> property.

5. SAME—DIVERSION OF PROPERTY BY MAJORITY.

> The majority faction of a local congregation or religious society,
> being one part of a large church unit, however regular its
> action or procedure in other respects, may not, as against
> a faithful minority, divert the property of the society to
> another denomination or to the support of doctrines fun-
> damentally opposed to the characteristic doctrines of the
> society, although the property is subject to no express or
> specific trust.

6. SAME—ORTHODOX JEWISH CONGREGATION—MIXED SEATING—USE
OF PROPERTY.

> An Orthodox Jewish congregation, which is prohibited from par-
> ticipation in services where there is mixed seating of the sexes,
> may not be deprived of the right to such use of their property
> by a majority group contrary to law.

7. SAME—COURTS—ECCLESIASTICAL MATTERS—PROPERTY RIGHTS.

> Civil courts do not interfere in matters of church polity purely
> ecclesiastical, but when property rights are involved they are
> to be tested in the civil courts by the civil laws.

8. SAME—PROPERTY—DEDICATION—DIVERSION.

> Property of a religious society that is dedicated to the use
> of a religious denomination cannot thereafter be diverted
> to the use of those who depart from that faith, but must
> remain for the use and benefit of those who still adhere
> to the faith.

9. SAME—PROPERTY—TRUSTS.

> A conveyance of land to the original trustees of a religious
> society conveys the land in trust for the purposes for which
> the congregation was formed.

10. SAME—PROPERTY—TRUSTS.
>   A conveyance or bequest to a religious association or to trustees for such association, necessarily implies a trust.

11. SAME—ORTHODOX JEWISH CONGREGATION—PROPERTY—SEPARATE SEATING OF SEXES.
>   Undisputed testimony that Orthodox Judaism requires that sexes be separately seated in the synagogue during religious services provided for a use of the property dedicated to the use of an Orthodox Jewish congregation which was subject to protection by the civil courts, notwithstanding a majority of the congregation had voted to have mixed seating.

Appeal from Macomb; Kane (Edward T.), J., presiding. Submitted January 7, 1959. (Docket No. 20, Calendar No. 47,666.) Decided June 5, 1959.

Bill by Meyer Davis, Sam Schwartz and Baruch Litvin against J. N. Scher, Morris Feldman and other members of the Board of Trustees of Congregation Beth Tefilas Moses, an Orthodox Jewish congregation, to enjoin use of synagogue property in certain manners not in accord with Orthodox practice. Bill dismissed. Plaintiffs appeal. Reversed and remanded.

*Walsh, O'Sullivan, Stommel & Sharp,* for plaintiffs.

*Charles Rubiner* and *Arthur James Rubiner,* for defendants.

*Amici Curiae:*

Rabbinical Council of America and Union of Orthodox Jewish Congregations of America, by *Samuel Lawrence Brennglass.*

KAVANAGH, J. Plaintiffs-appellants are members of Congregation Beth Tefilas Moses, a Jewish syna-

gogue located in the city of Mt. Clemens in Macomb county, Michigan. The defendants-appellees constitute the board of trustees of the congregation.

The congregation was founded in the year 1911 and was incorporated under PA 1897, No 209, as an ecclesiastical corporation. The charter of the corporation lapsed for failure to file reports in 1934 and the congregation has continued as an unincorporated association down to the present time. The original constitution was adopted in 1918 and was printed in Yiddish. The present constitution was adopted in 1953 or 1954. The land on which the synagogue was built in 1921 was acquired by the congregation between 1912 and 1919. When the synagogue was built, it was constructed with a women's balcony which has remained and been used as such down to the present controversy.

Plaintiff Litvin is a businessman and has been a member of the congregation for about 20 years. He served at one time as financial secretary of the synagogue and later as its president. In or about the year 1954 agitation for mixed seating arose in the congregation. On a vote the issue was voted down. A year later a committee was appointed for the purpose of considering the practice of mixed seating. Plaintiff Litvin and other members of the congregation opposed the move, pointing out that the Orthodox practice forbade mixed seating. However, the majority of the congregation voted for mixed seating and the defendants-appellees thereafter proposed to carry it out.

Following the vote to permit mixed seating, plaintiffs-appellants filed their bill in chancery, and a temporary injunction restraining mixed seating was entered. During the pendency of the temporary injunction some instances of mixed seating were attempted and the plaintiffs, consistent with their contention as to the requirement of Orthodox Jewish practice, left

the synagogue and worshiped in an Orthodox synagogue in Detroit.

Defendants filed a motion to dismiss alleging, among other things, that the court was without jurisdiction to adjudicate the dispute between the parties hereto, for the reason that such dispute is with respect to doctrinal and ecclesiastical matters only and not in relation to property rights; and it would be inconsistent with complete religious liberty for the court to assume such jurisdiction.

Defendants subsequently filed an answer to the bill.

The chancellor denied the motion to dismiss without prejudice to the rights of defendants to renew the same at the close of plaintiffs' proofs, and restrained any different seating arrangement for the holidays in September and October of 1955 than had prevailed for the corresponding holidays in 1954.

On the trial of the issue, before plaintiffs introduced their proofs, the court was informed by counsel for the defendants that they did not wish to cross-examine witnesses or present any proofs in the case and they would rely upon their motion to dismiss at the end of plaintiffs' proofs.

Plaintiff Litvin testified that he had been a member of the congregation for approximately 20 to 21 years. He further testified he had been an officer for a portion of this time and was familiar with the original constitution written in Yiddish. Mr. Litvin stated in response to a question as to whether the congregation had ever been served by other than Orthodox rabbis:

"*A.* Not to my recollection, ever since 1929 that I have been around Mt. Clemens they have been all Orthodox rabbis and those rabbis prior, which I know, they were also Orthodox rabbis."

A plan of the synagogue was identified and introduced in evidence which indicated that the plan called

for a balcony for the seating of women. Plaintiff
Litvin testified that segregated seating had been the
rule, with the exception of rare instances where wo-
men were permitted because they were sick or in-
valids to use the benches in the extreme southwest
part of the synagogue. He testified that this was the
Orthodox practice that men and women do not sit
together during prayer and that this congregation
was served by Orthodox rabbis. Mr. Litvin further
testified that after the institution of this suit he and
others left the synagogue when mixed seating was
attempted.

Rabbi David B. Hollander was then sworn and
testified that he was at that time the honorary presi-
dent of the Rabbinical Council of America and, also,
Rabbi of the Mount Eden Jewish Center in the
borough of Bronx. He testified that the Rabbini-
cal Council is an organization of Orthodox rabbis.
He further testified that the law prohibiting mixed
seating of the sexes is a fundamental law of the
Jewish religion. He stated that in the past few
years in America there have grown 2 new movements
in the Jewish religion, one referred to as the Con-
servative, the other the Reform movement, and that
both practiced mixed seating. Rabbi Hollander
stated in response to a question:

"*Q.* Now, if you walked into a synagogue, Rabbi
Hollander, would there be any immediate observable
difference, any differentiation, let's say, between an
Orthodox, Conservative or a Reform synagogue?

"*A.* That's correct, the immediate observable thing
would be that the men and women in the Orthodox
synagogue would be required to be separated and the
Conservative and Reform they would not."

Rabbi Hollander further stated that the mixed
seating arrangement with reference to the Mt. Clem-
ens synagogue had been called to the attention of his

council and they had condemned it. In reply to a question by the chancellor, Rabbi Hollander testified that an Orthodox Jew could not worship in a synagogue where there is mixed seating.

Similar testimony was offered by Rabbi Dr. Samson R. Weiss. Rabbi Weiss also testified that the original constitution adopted in 1918 was a constitution of a synagogue which wishes to be an Orthodox traditional synagogue.

At the close of plaintiffs' proofs defendants were asked if they cared to present any proofs. They again informed the court that they did not wish to do so but would rely on their motion to dismiss. The court granted the motion on the theory this controversy was strictly a religious question and the matter of a property right was not involved.

Plaintiffs appeal to this Court.

It is admitted that a civil court has no jurisdiction over ecclesiastical questions unless property rights are involved. It is not the responsibility or duty of our civil courts, nor have they the right, to interfere with the practice of religion in any way whatsoever. Hundreds of thousands of people came to the shores of the United States of America seeking the right to practice their religion in accordance with the dictates of their own conscience, driven in most instances by either majority in numbers or by power of enforcement to refrain from practicing their own particular religion and join in a State religion. The drafters of our Constitution had this in mind and have provided that the State cannot in any way interfere with the practice of religion. Under the Constitution and Bill of Rights, however, it is made equally clear that it is the courts' duty to preserve freedom of religion and its practice and to preserve the rights of minority groups. It is upon this theory of religious liberty that this country has enjoyed more religious freedom than any country in history.

· The Michigan Supreme Court has held on numerous occasions that the membership of a congregation, which is one of several congregations belonging to a particular religious faith to which the local church property and practice is dedicated, does not have the right to effect, by vote of a momentary majority, a change in religious practice, not conformable with the origin and historic character of the faith of the church of which the local congregation is one member, as against those who faithfully adhere to the characteristic doctrine of the church, and thereby deprive the minority of the use of the church property.

The weight of authority in Michigan is to the effect that the majority faction of a local congregation or society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust.

The defendants herein had an opportunity to present testimony to dispute plaintiffs' testimony. This they refused to do. Therefore, we are faced under the proofs with these unchallenged facts: (1) that this congregation was an Orthodox Jewish congregation; (2) that under the Orthodox Jewish law Orthodox Jews cannot participate in services where there is mixed seating; (3) that if mixed seating was enjoyed in this congregation Orthodox Jews would be prohibited from participating in services there. Clearly plaintiffs would be deprived of their right to the use of their synagogue—in other words deprived of the right of the use of their property and the use of the property by the majority group contrary to law. In the very early case of *Fuchs* v. *Mei-*

*sel,* 102 Mich 357, 373, 374 (32 LRA 92), Justice GRANT, writing for the Court, said:

"In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who chose to remain in the church, and who represent the regular church organization."

The same rule of law was followed in *Holwerda* v. *Hoeksema,* 232 Mich 648. It was also followed in *Borgman* v. *Bultema,* 213 Mich 684, involving the Christian Reformed Church in an appeal from Muskegon county.

Justice STEERE, writing in the case of *Hanna* v. *Malick,* 223 Mich 100 (syllabus), held:

"Where the articles of incorporation and the by-laws of a local Orthodox Greek church, as drafted and adopted by the original incorporators, who were natives of Syria, clearly express the intention to bring the church under the supreme authority and jurisdiction of the Patriarch of Antioch, those who adhere to that declaration of faith and recognized jurisdiction are entitled to the possession, control, and use of its property for its declared purpose as against those seceding from the original organization and seeking to divert its use and control to the jurisdiction of a Holy Russian Synod or patriarch."

Justice BUSHNELL in *Calvary Baptist Church of Port Huron* v. *Shay,* 292 Mich 517, 520, 521, quoted from *Komarynski* v. *Popovich,* 232 Mich 88, 99, as follows:

" 'In matters of church polity purely ecclesiastical, civil courts do not interfere, but when property rights are involved they are to be tested in the civil courts by the civil laws.' "

Justice SHARPE, writing in *Holt* v. *Trone,* 341 Mich 169, 174, said as follows:

"In the case at bar property rights are involved, namely, which group has the exclusive use and control of the church property. We have no concern with ecclesiastical disputes, and whether the 'New Testament' authorizes and empowers a life tenure for elders with divine right to rule is not a proper subject for our determination."

Justice BOYLES, in the case of *First Protestant Reformed Church* v. *DeWolf,* 344 Mich 624, 633, said:

"While courts do not interfere in matters of church doctrine, church discipline, or the regularity of the proceedings of church tribunals, and refuse to interfere with the right of religious groups to worship freely as they choose, the question of the property rights of the members is a matter within the jurisdiction of the courts and may be determined by the court."

Justice DETHMERS, writing in the case of *Michigan Congregational Conference* v. *United Church of Stanton,* 330 Mich 561, 575, 576, said:

"It is the well-established law of this State, declared in *Fuchs* v. *Meisel,* 102 Mich 357 (32 LRA 92); *Borgman* v. *Bultema,* 213 Mich 684; *Hanna* v. *Malick,* 223 Mich 100; and *United Armenian Brethren Evangelical Church* v. *Kazanjian,* 322 Mich 651, that while members of a church undoubtedly possess the legal right to withdraw from it, with or without reason, they may not, in so doing, take with them, for their own purposes, or transfer to any other religious body, property previously conveyed to, or

dedicated to the use of, the religious denomination from which they are withdrawing or one of its member churches, but such property must remain for the use and benefit of adherents to that denomination or those who represent it. Not inconsistent is the earlier case of *Wilson* v. *Livingstone,* 99 Mich 594, when viewed as having been predicated on the theory that the property involved in that case had not been dedicated to the use of any religious denomination.

"The property involved in the instant case belonged, originally, to the First Congregational Church of Stanton and was, as such, dedicated to the use of the religious denomination commonly called Congregational, of which the Stanton church was a part. When, in the year 1937, members of the First Congregational Church of Stanton dissolved its corporate existence and undertook to take its property with them into the newly-incorporated United Church of Stanton (defendant), the legality of that attempt depended upon whether the new organization was a part of the religious denomination commonly called Congregational. If it was not, they could not, in leaving the Congregational denomination, take the property with them into the new church organization and convey it to the latter."

Justice BOYLES in *United Armenian Brethren Evangelical Church* v. *Kazanjian,* 322 Mich 651, 660, quotes from *Borgman* v. *Bultema,* 213 Mich 684, 689, as follows:

" 'No one disputes, where property is dedicated to the use of a religious denomination it cannot thereafter be diverted to the use of those who depart from that faith, but must remain for the use and benefit of those who still adhere to the faith.' "

The conveyance of the land to the original trustees and to the congregation conveyed the land in trust for the purposes for which the congregation was formed.

"A conveyance or bequest to a religious association, or to trustees for such association, necessarily implies a trust." *Fuchs* v. *Meisel, supra.* (Syllabus.)

As to an express trust, the rule is well established and set forth in 45 Am Jur, Religious Societies, § 61, pp 771, 772, as follows:

"Where property has been dedicated by way of trust for the purpose of supporting or propagating definite religious doctrines or principles, it is the duty of the courts to see that the property so dedicated is not diverted from the trust which has been thus attached to its use. So long as there are persons who are qualified within the meaning of the original dedication and are also willing to teach the doctrines or principles prescribed in the act of dedication, and so long as there is anyone so interested in the execution of the trust as to have a standing in court, a diversion of the property or fund to other and different uses can be prevented. * * * It is not within the power of the congregation, by reason of a change of views on religious subjects, to carry such property to the support of a new and conflicting doctrine; in such case, the secular courts will, as a general rule, interfere to protect the members of an ecclesiastical organization who adhere to the tenets and doctrines which it was organized to promulgate in their right to use the property, as against those members who are attempting to divert it to purposes utterly foreign to the organization, and will enjoin its diversion from the trust."

In the case of *Fisher* v. *Congregation B'Nai Yitzhok,* 177 Pa Super 359 (110 A2d 881) the superior court of Pennsylvania dealing with a similar proposition of law dealt with it in accordance with the Michigan rule. Plaintiff was an ordained rabbi of the Orthodox Hebrew faith. He was a professional rabbi-cantor. Defendant was an incorporated Hebrew congregation with a synagogue in Phila-

delphia. Plaintiff, in response to defendant's advertisement in a Yiddish newspaper, appeared in Philadelphia for an audition before a committee representing the congregation. As a result, a written contract was entered into on June 26, 1950, under the terms of which plaintiff agreed to officiate as cantor at the synagogue of the defendant congregation "for the High Holiday Season of 1950," at 6 specified services during the month of September, 1950. Compensation for the above services was to be $1,200. The congregation up to that time had been conducted without mixed seating of the sexes. At a general meeting of the congregation on July 12, 1950, on the eve of moving into a new synagogue, the practice of separate seating by the defendant formerly observed was modified. When plaintiff was informed of the action of the defendant congregation, he, through his attorney notified the defendant that he, a rabbi of the Orthodox faith, would be unable to officiate as cantor. When defendant failed to rescind its action, plaintiff refused to officiate. He was able to obtain employment as cantor for one service which paid him $100. He brought suit for the balance of the contract price.

Testimony of 3 rabbis learned in Hebrew law appeared for the plaintiff and testified to the effect "that Orthodox Judaism required a definite and physical separation of the sexes in the synagogue." Testimony was also established that an Orthodox rabbi-cantor could not conscientiously officiate in a synagogue that violates such Jewish law. Judgment for the plaintiff in the sum of $1,100 was entered plus interest. The court on appeal said:

"In determining the right of recovery in this case the question is to be determined under the rules of our civil law, and the ancient provision of the Hebrew law relating to separate seating is read into the contract only because implicit in the writing as to

the basis—according to the evidence—upon which the parties dealt."

The court affirmed the judgment of the lower court.

The rule above set forth for Michigan has been followed in other States.

In their contention that ecclesiastical matters above are involved, defendants rely heavily upon *Katz* v. *Goldman*, 33 Ohio App 150 (168 NE 763). Here the court (p 163) adopted a theory that if they were to try to define just Orthodox and Traditional Judaism there would be such a divergence of opinions that it would result in multiplying dissension instead of eliminating it.

Here, because of defendants' calculated risk of not offering proofs, no dispute exists as to the teaching of Orthodox Judaism as to mixed seating.

The case is reversed and remanded for entry of a decree in accordance with this opinion. Costs in favor of plaintiffs-appellants.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and VOELKER, JJ., concurred.