MACEDONO-BULGARIAN ORTHODOX CHURCH ST. CLEMENT OHRIDSKI *v.* MACEDONIAN PATRIOTIC ORGANIZATON FATHERLAND

KUROP *v.* YOVAN

OPINION OF THE COURT

1. RELIGIOUS SOCIETIES — WITHDRAWAL OF MEMBERSHIP — CHURCH PROPERTY — FAITHFUL MINORITY.

Members of a religious organization may withdraw from that organization, but they cannot take with them or transfer to any other religious body the property dedicated to and conveyed for the worship of God under the discipline of the religious organization from which they are withdrawing,

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 45 Am Jur, Religious Societies § 16.
[2] 45 Am Jur, Religious Societies § 40 *et seq.*
Suspension or expulsion from professional association and the remedies therefor.  20 ALR2d 421.
[3] 45 Am Jur, Religious Societies §§ 59, 60.
[4, 5] Determination by the civil courts or property rights between contending factions of an independent or congregational church. 70 ALR 75.
[4] 45 Am Jur, Religious Societies § 68.
Change of denominational relations or fundamental doctrines by majority faction of independent or congregational church as ground for award of property to minority.  15 ALR3d 297.
[5] 45 Am Jur, Religious Societies §§ 59, 66.

nor can the withdrawing members prevent the use of that property by the non-withdrawing members who represent the regular religious organization.

2. Religious Societies—Ordained Priest—Defrockment—Courts —Jurisdiction.

Defrockment of an ordained priest of a church is an ecclesiastical matter and is not within the jurisdiction of civil courts.

3. Religious Societies—Church Property—Ownership.

A priest who voluntarily left plaintiff church corporation's mother church and affiliated with another church, and was defrocked by the governing body of the mother church, was properly required by the trial court to account for church property, to turn over such property to plaintiff church, and to refrain from attempting to conduct religious services on premises owned by plaintiff church, or to use any of its property, until such time as plaintiff church reinstated him.

4. Religious Societies—Church Property—Faithful Minority.

A faction of a local congregation or society, being one part of a large church unit, may not, as against a faithful group, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, even though the property is subject to no expressed trust.

Dissenting Opinion

Bronson, J.

5. Religious Societies—Ecclesiastical Schisms—Church Property—Courts—Jurisdiction—Constitutional Law.

*Civil courts are constitutionally forbidden to delve into areas of apparent ecclesiastical schisms in order to decide which religious faction owns or has a right to church property (US Const, Am 1).*

Appeal from Wayne, Thomas J. Foley, J. Submitted Division 1 June 5, 1969, at Detroit. (Docket Nos. 5,079, 5,080.) Decided February 3, 1970. 21 Mich App 281. Rehearing granted April 13, 1970. Decided November 27, 1970.

Complaint by Macedono-Bulgarian Orthodox Church Saint Clement Ohridski against Macedonian Patriotic Organization Fatherland and George Nicoloff for an injunction restraining George Nicoloff from conducting services in the church, and from using the church's property, and for an accounting. Complaint by Gilbert Kurop and others against Alexander Yovan and others and Macedono-Bulgarian Orthodox Church Saint Clement Ohridski for a determination of the proper governmental body of the temporal affairs of the church, appointment of a receiver and an accounting. Cases consolidated. Partial summary judgments in favor of plaintiff church in the first case and defendants in the second case. Defendants in the first case and plaintiffs in the second case appeal. Vacated. Rehearing granted. Affirmed.

*Arthur J. Hass* for appellees.

*McClintock, Fulton, Donovan & Waterman* (*Thomas A. Roach,* of counsel) for appellants.

Before: HOLBROOK, P. J., and McGREGOR and BRONSON, JJ.

### ON REHEARING

HOLBROOK, P. J. This Court first ruled on these cases as reported in 21 Mich App 281. On the 13th day of April, 1970, this Court on application of all the parties ordered a rehearing. We now write this opinion considering all the briefs submitted concerning the rehearing and after reviewing the entire matter.

The facts of these cases are clearly set forth in the learned trial judge's rulings. Although the court rendered partial summary judgments, the

court did, before its determination, consider all the pleadings and depositions and took considerable testimony in the cases.

Supplemental facts which are helpful in understanding better the circumstances surrounding this controversy are added, *viz.*: a portion of the subject property, located at 2950 25th Street in the City of Detroit, which is presently being occupied by the church's former priest, George Nicoloff, a defendant herein, was, from 1938, owned by the defendant Macedonian Political Organization "Fatherland" which, in that year, became a nonprofit corporation. In July, 1957, the organization changed its name to Macedonian Patriotic Organization "Fatherland". The plaintiff, Macedono-Bulgarian Orthodox Church St. Clement Ohridski (hereinafter referred to as St. Clement Ohridski) was organized as a voluntary association in 1935 as evidenced by the "Statutes of the Macedonian-Bulgarian Orthodox Parish 'St. Clement Ohridski' " which provided in part as follows:

"Article 1.    The Bulgarian immigrants from Bulgaria, Macedonia, and from wherever else they may have been born, but who live in Detroit and its environs, and who according to their Christian belief belong to the Holy Bulgarian Orthodox Church, organized on February 17, 1935, a Macedonian-Bulgarian Orthodox parish, under the name of 'St. Clement Ohridski'.

"Article 2.    This parish, in its spiritual relationship, exists under the administration of the Bulgarian Exarchate and recognizes as its ecclesiastical guide and authority the Holy Synod of the Bulgarian Orthodox Church, at whatever place this Holy Synod may be found.

"Article 3.    The principal aim of this ecclesiastical parish is to satisfy the religious and spiritual needs of its parishioners and to promote spiritual

and religious activity, which will be in full harmony with the canons, bylaws and the traditions of the Holy Bulgarian Orthodox Church.

"Article 4. The statutes of the Exarchate, the regulations, the circular letters of the Holy Synod, the present statutes and the bylaws worked out in the spirit of these statutes and as their supplement will be the lawful rules for the discipline and internal life of this church parish."

These statutes have never been changed. In May, 1960, plaintiff church, whose priest was defendant George Nicoloff, was incorporated as a Michigan nonprofit ecclesiastical corporation. The Macedonian Patriotic Organization "Fatherland", by warranty deed, conveyed title to the 25th Street property to St. Clement Ohridski, on April 6, 1961, reserving to itself certain rights to the premises.

The amended complaint of the plaintiff alleged that: (a) St. Clement Ohridski is a qualified ecclesiastical corporation incorporated under the laws of the State of Michigan whose articles of association filed May 24, 1960, were subscribed to by George Nicoloff and state in part:

"The members of said church agree to worship and labor together according to the discipline, rules and usage of the Archdiocese of the Bulgarian Eastern Orthodox Church in the United States of America as from time to time authorized and declared by the Holy Synod of the Bulgarian Eastern Orthodox Church   *   *   *   ."

(b) The Bulgarian Eastern Orthodox Church, Diocese of America, North and South, and Australia, was constituted by the Holy Synod of the Bulgarian Church on December 31, 1937, and on the 27th day of June, 1947, it was incorporated, as a church corporation in the State of New York and at the

time of its incorporation, the defendant, George Nicoloff, was a trustee thereof.

The defendant answered: (a) The new charter of 1960 is admitted as alleged, with an assertion that the charter should have included other wordage; (b) that the original articles of incorporation in 1935 [sic] provided that the church or society "shall worship and labor together according to the discipline, rules and usage of the Archdiocese of the Bulgarian Eastern Orthodox Church in the United States of America as from time to time authorized and declared by the Holy Synod of the Bulgarian Eastern Orthodox Church", and, further, admitted the incorporation of 1947 but asserted that it had the effect of reconstituting the plaintiff and the other churches involved, free of any administrative control of the Holy Synod.

Plaintiff, St. Clement Ohridski, also alleged in its complaint that in 1963 defendant George Nicoloff and others attempted to create a new Bulgarian Orthodox Diocese in the United States, headed by Bishop Kyril Yonchev, which was not authorized by the Holy Bulgarian Eastern Orthodox Church nor by the Ecumenical Patriarch at Constantinople; that defendant Nicoloff, aided by the defendant Macedonian Patriotic Organization has, through the diversion of church property to the new diocese, attempted to cause plaintiff church to secede from the Holy Synod's duly constituted Diocese of America, North and South, and Australia, and to become associated with the new diocese of defendant Nicoloff, a diocese fundamentally opposed to the faith, doctrines, customs, usages and discipline of the Mother Church in Bulgaria. Plaintiff church further alleged that the Diocese of America, North and South, and Australia is the only diocese having

jurisdiction over the plaintiff church with the approval of the Holy Synod of the Bulgarian Eastern Orthodox Church and that the property of plaintiff church is and continually has been dedicated to the use of the faithful members of the Holy Synod of the Bulgarian Eastern Orthodox Church.

The following testimony of defendant Nicoloff and Gilbert Kurop, a follower of defendant Nicoloff, clearly indicates that the schism within plaintiff church developed in 1963, after the claimed defrockment of defendant Nicoloff by Bishop Andrey, defendant Nicoloff attempted to form a new diocese independent of the Bulgarian Holy Synod.

In his deposition of September 28 and 29, 1966, defendant Nicoloff stated as follows:

"*A.* In 1963 we separated parishes and clergy from the authority of the ecclesiastical authority of Bishop Andrey.

"*Q.* And did this new organization that separated, as you say, receive the sanction of the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* Not of the Holy Synod of the Bulgarian Eastern Orthodox Church, because we never asked for that. But we received the sanction of the Holy Synod of the Russian Orthodox Church Outside Russia here in the United States.

"*Q.* I see. So that the way you have this now, your present diocese has no connection whatsoever—

"*A.* With the—

"*Q.* —with the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* We have no administrative connection with the Holy Synod of the Bulgarian Eastern Orthodox Church, but spiritually we are the Bulgarian Eastern Orthodox Church.

\* \* \*

"*Q.* Do you regard yourself now under the jurisdiction of the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* No.

\* \* \*

"*Q.* When was the authority of the Holy Synod renounced?

"*A.* We never renounced the authority of the Holy Synod in the spiritual meaning of that word. We denounced—we decided only that from this date we were not going to have administrative orders from the Holy Synod on account of the fact that the Holy Synod of the Bulgarian church is not free; it is under the pressure of the communistic government.

"*Q.* I see. That was in 1963?

"*A.* Correct.

"*Q.* Well, was there any time at all that the jurisdiction of the Holy Synod over you was renounced?

"*A.* The jurisdiction of the Holy Synod over me was denounced when I received information from Bishop Andrey that the so-called defrocking had been approved by the Holy Synod.

"*Q.* I see. You renounced your allegiance to the Holy Synod; is that correct?

"*A.* Correct.

"*Q.* And as of today that renunciation still stands?

"*A.* Yes."

In the deposition of Gilbert Kurop it was stipulated that his testimony would be binding upon the other deponents aligned with the Nicoloff faction. The following appears therein:

"*Q.* Do you recognize that the Holy Synod of the Bulgarian Orthodox Church is one of the autocephalic divisions of the Ecumenical Council of the Eastern Orthodox Church?

"*A.* I do not recognize the Holy Synod in its ecclesiastical function.

\* \* \*

"*Q.* Will you give me the hierarchy of that church to which you are now associated.

"*A.* In religious order it would be parishioner, protospirit, deacon, priest, bishop, Christ.

\* \* \*

"*Q.* Does the man you call George Nicoloff—Reverend George Nicoloff—agree that the man you call Bishop Yoncheff has no superior?

"*A.* Yes.

"*Q.* So that, ecclesiastically, your group had now formed a church in a diocese which is completely separated, ecclesiastically, from the Holy Synod of the Bulgarian Eastern Orthodox Church?

"*A.* That is correct."

The certificate of incorporation of the Bulgarian Eastern Orthodox Church, Diocese of America, North and South, and Australia, dated June 27, 1947, stated in part:

"(d) *The term of office of His Grace Andrey Velichky, incumbent bishop and ecclesiastical administrator, shall be for life and his successors in said office shall be appointed by the Holy Synod of Bulgaria and shall qualify as such provided that each successor is elected as such at a stated or at a special convention of the diocese.*"  (Emphasis supplied.)

Bishop Andrey of the Holy Synod of the Bulgarian Eastern Orthodox Church, Sofia, Bulgaria, was appointed head of the Diocese of America, North and South, and Australia, in 1938, when that diocese was created by the Holy Synod. In 1947 when the diocese was incorporated under the laws of the State of New York he was named as the bishop of that diocese in the articles of incorporation. It is undisputed that he was the bishop to whom plaintiff church declared allegiance at all times pertinent to the suits. Bishop Andrey was the bishop of the

diocese in question at the time of the disagreement with Father Nicoloff in 1963 as well as at the time when these matters were before the court for determination.

The trial court's opinion, granting partial summary judgment to the plaintiff church on the amended complaint, stated:

"Briefly stated, the facts, for the purposes of this motion for summary judgment, as gleaned from the pleadings, depositions and pretrial statements appear as follows:

"The Macedono-Bulgarian Orthodox Church is a Michigan ecclesiastical nonprofit corporation affiliated with the hierarchial structure of the Bulgarian Orthodox Church, having its Holy Synod in Bulgaria.

"Bulgaria, prior to the facts here in question, fell under Russian domination and was subject to the political domination of the Communist Party. There are allegations that this domination has been extended to the hierarchial structure of the Bulgarian Orthodox Church.

"At the instance of Bishop Andrey procedures were set in motion which culminated in the defrockment of Father George Nicoloff. This was confirmed by the hierarchy in Bulgaria on or before December 4, 1964.

"Father Nicoloff refused to recognize the actions of Bishop Andrey or the hierarchy in Bulgaria, alleging that they were under control of the political powers of a foreign government.

"Further, that Father Nicoloff, at the time of the defrockment, was in fact duly ordained as a priest of the Russian Orthodox Church, Outside Russia—thus was outside the jurisdiction of Bishop Andrey at the time of defrockment.

"Father Nicoloff has continued on in the church property owned by the Macedono-Bulgarian Orthodox Church during the course of this controversy

under a directive of the Honorable James Montante, wherein the status quo of the parties would be maintained in this regard.

"A very serious question, with far-reaching ramifications, is presented at the outset of our discussions; namely, the defrockment of Father Nicoloff, and the right of the court to inquire into the ecclesiastical decision determining this defrockment.

"The free exercise of religious beliefs, unhampered by judicial, or legislative, interference is fundamental in our basic concept of constitutional government. The interference with ecclesiastical decision and the abhorrence of such interference very early gave birth to the basic concept of separation of church and state.

"It goes without saying that to meddle with religious concepts that have withstood the ravages of centuries, and ecclesiastical actions based thereon, because of the vicissitudes of current political influence on some individuals, if such exists, would destroy all religious concepts and create total and utter confusion in all religions of wide-spread acceptance.

"The United States Supreme Court, in *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America* (1952), 344 US 94, 114 (73 S Ct 143, 153; 97 L Ed 120, 135), quoting from *Watson* v. *Jones* (1872), 80 US (13 Wall) 679 (20 L Ed 666), states so aptly and succinctly:

" 'In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted ques-

tions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.'

"This controversy involves a question of discipline and ecclesiastical rule or law, and is, truly speaking, a matter of ecclesiastical government. The question of defrockment is not a matter for the civil courts.

"There can be no question that prior to the takeover of Bulgaria by the Russians the procedures followed leading up to the defrockment of Father Nicoloff would not have been subject to scrutiny by civil courts. There is none now.

"There is no question here regarding the use of churches for subversive purposes. Any acts of subversion would be treated under and pursuant to laws and regulations designed for that purpose. This court does not recognize any ecclesiastical immunity in the case of subversive acts, nor would it tolerate the distortion of ecclesiastical law for that purpose. However, this is not the question before the court. See *Kedroff* v. *Saint Nicholas Cathedral of the Russian Orthodox Church in North America, supra.*

"It is not necessary that this court rely on the fact of defrockment in determining the disposition

of church property presently held by Father Nico-loff.

"Father Nicoloff is a priest of the Russian Ortho-dox Church Outside of Russia. The choice of religious affiliation was his to be exercised as he desired.

"The Michigan Supreme Court, in *Immanuel Evangelical Lutheran Church* v. *Fromm* (1962), 367 Mich 575, 588, quoting from *Fuchs* v. *Meisel* (1894), 102 Mich 357, 373 (32 LRA 92), states in part:

" 'In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without rea-son. But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who choose to remain in the church, and who represent the regular church organization.'

"It is thus the opinion of this Court that Father Nicoloff's defrockment was a matter of ecclesiastical decision outside the area of civil court jurisdiction; and, further, that Father Nicoloff, being thus de-frocked and/or, in any event, having voluntarily left the plaintiff, Macedono-Bulgarian Orthodox Church for the Russian Orthodox Church Outside of Russia, must surrender any and all properties in his possession to said plaintiff church.

"Those questions pertaining to the Macedonian Patriotic Organization Fatherland present certain questions of fact; therefore must await a hearing on the merits.

"This court thus grants partial summary judg-ment to plaintiff on the amended complaint.

"1. That defendant George Nicoloff be required to account for properties in his possession or coming into his possession on behalf of the plaintiff church

subsequent to his last accounting, and that said properties be turned over to plaintiff church.

"2. That defendant George Nicoloff be restrained permanently from attempting to conduct any services in or on the premises owned by the plaintiff church, and from using any of the church's real or personal property unless and until such time as he be reinstated with plaintiff church.

"A further question has been raised in Suit No. 44030, and by order of court at pre-trial was consolidated with the original case involving the Macedono-Bulgarian Orthodox Church.

"This question appears as follows: What persons are entitled to membership in the Macedono-Bulgarian Orthodox Church, pursuant to requirements set forth in the statutes of the church?

"It would appear to the court that this question when answered is decisive of the additional question of who is entitled to hold office.

"The statutes of the Macedono-Bulgarian Orthodox Parish Saint Clement Ohridski spell out specifically and unequivocally the requirements for membership. The court refers more specifically to Articles 1, 6, 7, 8, 9 and 10.

"It is this court's opinion that the trial of the issues in the instant case be restricted to proofs regarding the ineligibility of or eligibility of individuals to membership in the Macedono-Bulgarian Orthodox Parish pursuant to the provisions of the articles hereinbefore mentioned."

In its opinion denying the motion for rehearing filed by defendant Nicoloff in the first case, and plaintiff Kurop, *et al.,* in the second case, the trial court stated as follows:

"This matter comes on for decision by way of motion for rehearing sought by defendant George Nicoloff, (Case No. 44030), and plaintiff Gilbert Kurop, *et al.,* (Case No. 64477), wherein defendant

(44030) and plaintiff (64477) seek to set aside certain summary judgments heretofore entered.

"This court has again reexamined all the *pleadings, depositions* and *evidence* in the instant case. The court has also reviewed its notes of arguments advanced by counsel.

"The Macedono-Bulgarian Orthodox Church is a Michigan ecclesiastical nonprofit corporation affiliated with the hierarchial structure of the Bulgarian Orthodox Church, having its Holy Synod in Bulgaria.

"The statutes of the Bulgarian Orthodox Church specifically state and recognize the hierarchial structure of the church having its Holy Synod in Bulgaria.

"The articles of incorporation of the Macedono-Bulgarian Orthodox Church Saint Clement Ohridski, a Michigan ecclesiastical nonprofit corporation, specifically state and recognize the hierarchial structure of the church having its Holy Synod in Bulgaria.

"The mere statement by Father Nicoloff or any other does not and will not change the hierarchial structure of the Bulgarian Orthodox Church nor the fact that the Holy Synod is in Bulgaria.

"Father Nicoloff became a priest in the Macedono-Bulgarian Orthodox Church in 1935.  This is the same church which by church statute is hierarchial in structure with its Holy Synod in Bulgaria.

"Father Nicoloff acknowledges in his deposition under oath that Bishop Andrey set in motion procedures which culminated in the defrockment of himself; that this was confirmed by the hierarchy in Bulgaria some time on or before December 4, 1964; that Bishop Andrey was the bishop in the United States of the Bulgarian Eastern Orthodox Church; that Bishop Andrey at the time of the defendant's defrocking was in good standing with the Holy Synod.

"Defendant's position bears a remarkable resemblance to that proverbial act of having one's cake

and eating it also. The defendant when speaking of defrockment or church property looks upon his church as congregational in structure; when speaking canonically the defendant acknowledges the reality of a hierarchial structure with its Holy Synod in Bulgaria.

"The question of defrockment was, as defendant Nicoloff has stated in his deposition, determined by ecclesiastical law. The defendant chose not to appeal according to procedures provided for appeals. This court neither approves nor disapproves what took place, but does accept the accomplished fact.

"As this court stated in its prior opinion:

" 'The free exercise of religious beliefs, unhampered by judicial, or legislative, interference is fundamental in our basic concept of constitutional government. The interference with ecclesiastical decision and the abhorrence of such interference very early gave birth to the basic concept of separation of church and state.

" 'It goes without saying that to meddle with religious concepts that have withstood the ravage of centuries, and ecclesiastical actions based thereon, because of the vicissitudes of current political influence on some individuals, if such exists, would destroy all religious concepts and create total and utter confusion in all religions of wide-spread acceptance.

" 'This controversy involves a question of discipline and ecclesiastical rule or law, and is, truly speaking, a matter of ecclesiastical government. The question of defrockment is not a matter for the civil courts.'

"It is interesting to note that counsel for defendant Nicoloff on more than one occasion argued most vociferously that Bishop Andrey could not defrock Father Nicoloff for the reason that the Father was in fact a priest in the Russian Orthodox Church Outside of Russia at the time of the alleged defrockment; therefore he was not subject to Bishop An-

drey's decree.  I assume from defendant Nicoloff's present position that he has abandoned this interpretation of the evidence.

"The question of whether or not Father Nicoloff was ordained as a priest of the Russian Orthodox Church Outside of Russia this court feels is of little moment.  The point was raised by the court because it had been advanced by Father Nicoloff's counsel in vigorous argument.  The main thrust of the court's opinion was based upon the fact of defrockment heretofore treated.  The ordination in another church as previously advanced, if such had existed, neither added nor detracted from the prior conclusions.

"In the second case the plaintiffs Kurop, *et al.* (Case No. 64477), alleged that the defendants did fail to comply with the church statutes in certain respects.

"Testimony was offered at the commencement of the trial on Case No. 64477.  A witness was being cross-examined regarding bylaws of defendant nonprofit ecclesiastical corporation.  The witness, Mr. Yovan, a defendant, was asked to identify the church statutes as the bylaws of defendant corporation.  This the witness denied.

"The court then determined that if plaintiff relied upon the church statutes to be the corporate bylaws, and such was not in fact true, the case had reached a critical point and proceeded to take testimony based upon this issue.

"The testimony showed and this court so found that the church statutes were in fact just that, and were designed and used for the purpose of guiding the ecclesiastical operations of the church.  The church statutes dealt with ecclesiastical matters.  The court further found no credible evidence that these statutes were used or intended for use as bylaws for the defendant corporation.  Further, as plaintiffs now appear to concede, the corporation had never adopted bylaws.

"Plaintiffs Kurop, *et al.*, denounce, pursuant to deposition statements, the hierarchial structure of the Macedono-Bulgarian Orthodox Church (at this point plaintiffs seem to adopt a congregational structure).

"The posture of the second case (No. 64477) thus was one wherein the plaintiffs were attempting to raise questions regarding church property held as it is in the defendant ecclesiastical corporation established by the church. The defendant's corporate charter and the church statutes specifically recognize and state that the Macedono-Bulgarian Orthodox Church is in fact a hierarchial structure with its Holy Synod in Bulgaria. The plaintiffs renounce and deny affiliation with the very church whose property they question. By the plaintiffs' own deposition they renounce any interest in the property, and are not proper party plaintiffs.

"Further, all allegations in the second suit, according to pleadings, arise by virtue of church statute as distinguished from corporate bylaws, there being no bylaws. The church statutes dealt with ecclesiastical matters as distinguished from corporate matters.

"The plaintiffs thus desired this court to interpret matters purely and simply ecclesiastical and apply them to the defendant corporation. An example of this was the very question asked of witness Yovan, wherein reference was made to the statutory (church) provisions regarding baptism.

"To allow questions regarding the validity of baptism within the Macedono-Bulgarian Orthodox Church would have placed the civil courts squarely in the middle of a determination of church doctrine, its interpretation and application on the most important ecclesiastical question of baptism.

"This court therefore concluded that the plaintiffs were not in fact proper parties to bring the law suit, and, further, that while the complaint (64477) al-

leges that defendants did certain acts in relation to the church statutes which deal with the ecclesiastical matters, no mention was made of any acts in relation to corporate bylaws, which plaintiffs' proofs on hearing showed were non-existing. The court thus refused to entertain ecclesiastical matters."

The records in these causes supporting the decision arrived at by the trial court, as they do, the trial court's opinions as hereinabove set forth are adopted.

The rights as between two contending factions to possess, occupy and use the church property pursuant to the church's articles of incorporation, (or association), was considered in the analogous case of *Hanna* v. *Malick* (1923), 223 Mich 100. That case involved opposing factions in an incorporated religious association of members of the Greek Church faith. The purpose of the corporation's organization, as stated in its articles of association, was that of promulgating the Christian religion according to the tenets, doctrines and creed of the Syrian Greek Orthodox Church of Antioch, Syria, and the Syrian Greek Orthodox Church of America, as expounded by the Bishop of Brooklyn, New York. The schism in the local St. George's First Syrian Greek Orthodox Church developed after the death of Bishop Raphael, head of the Syrian Greek Orthodox Church in the United States. The local priest requested his congregation to declare, in writing, their loyalty to a Russian bishop of the Holy Synod of Russia. The plaintiffs refused to subscribe to the declaration of loyalty, also refusing to allow their local priest to mention the name of a Russian bishop as his highest church authority. Plaintiffs insisted that the priest mention the name of the Patriarch of Antioch, the Mother Church, as his highest authority, pending

appointment of a Syrian bishop as Bishop of Brooklyn. Members of the local church who were willing to subscribe to the writing attempted to amend the articles of association of the local church by placing the church property and service in the name, and under the immediate control, of the Russian Holy Synod. As in the instant cases under consideration, a break with the Mother Church was attempted, with a consequent division of the local church into two factions. In *Hanna,* just as in the cases at hand, the plaintiffs, members of the regular church organization, claimed that they were ousted from their alleged just and rightful use of the church property by the dissident faction. Our Supreme Court in *Hanna* was called upon to determine, as this Court must likewise determine, to which faction the church property rightfully belonged.[1] Resolution of this question does not necessitate a decision upon matters of an ecclesiastical nature, which are not within the jurisdiction of the civil courts to declare. *United Armenian Brethren Evangelical Church* v. *Kazanjian* (1948), 322 Mich 651; *Berkaw* v. *Mayflower Congregational Church* (1969), 18 Mich App 245; *Davis* v. *Scher* (1959), 356 Mich 291; *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 US

---

[1] MCLA § 450.183 (Stat Ann 1963 Rev § 21.184): "[E]very such ecclesiastical corporation shall have power to acquire, hold, sell and convey property, both real and personal for the general purposes of such corporation, * * * . It may acquire real estate by gift, purchase or devise for the purpose of having and holding land and buildings for its own use and occupancy, * * * ."

[2] At p 449 the Court stated in part: "It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded."

440 (89 S Ct 601, 21 L Ed 2d 658),[2] (On Remand, 1969), 225 Ga 259 (167 SE2d 658), *cert. den.* (1970), 396 US 1041 (90 S Ct 680, 24 L Ed 2d 685); *The Maryland and Virginia Eldership of the Churches of God* v. *The Church of God at Sharpsburg* (1970), 396 US 367 (90 S Ct 499, 24 L Ed 2d 582).

The Supreme Court in *Hanna, supra,* adopted with approval the opinion of the trial court which granted the church property to plaintiffs, representatives of the regular church organization. The Court, quoting from the trial court opinion, stated at p 118:

" 'The attempt of the defendants to amend the articles of association and bylaws as orginally drafted, so as to place the supervision, control and instructions of this local church and the church property herein described within the ownership and under the direction and authority of the Holy Synod of Russia, was unwarranted and illegal and of no force or avail.

" 'The court concludes that the plaintiffs have been illegally deprived of the possession and control of the church property and premises in question; plaintiffs have maintained the allegations of their bill, and they represent the regular church organization. This opinion makes no decision as to ecclesiastical authority or conflict of authority of different branches of the Greek Orthodox Church within the United States' ".

The Court further stated at pp 118, 119:

"Plaintiffs are evidently moved to this controversy by a religious sentiment involving community of race, language and reverence for the ancient church as organized in the land of their nativity, * * *. The purpose and intention of the original incorporators to legally stamp with those distinctions this church of their faith organized by them

in the land of their adoption is plainly declared in their corporate articles of association and repeated in the bylaws. They acquired and consecrated to that particular purpose the property in controversy here. * * *

"Those who thus organized this Syrian ecclesiastical society, acquired the property in question for the purposes of the organization and thereafter adhered to that declaration of faith and recognized jurisdiction are entitled to the possession, control and use for such purposes of the property so acquired as against those seeking to divert its use and control to the jurisdiction of a Holy Russian Synod or patriarch."

In *Davis* v. *Scher, supra,* the Court stated at p 298:

"The Michigan Supreme Court has held on numerous occasions that the membership of a congregation, which is one of several congregations belonging to a particular religious faith to which the local church property and practice is dedicated, does not have the right to effect, by vote of a momentary majority, a change in religious practice, not conformable with the origin and historic character of the faith of the church of which the local congregation is one member, as against those who faithfully adhere to the characteristic doctrine of the church, and thereby deprive the minority of the use of the church property.

"The weight of authority in Michigan is to the effect that the majority faction of a local congregation or society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust."

See, also, *Fuchs* v. *Meisel* (1894), 102 Mich 357; *Borgman* v. *Bultema* (1921), 213 Mich 684; *Michigan Congregational Conference* v. *United Church of Stanton* (1951), 330 Mich 561; *Second Protestant Reformed Church of Grand Rapids* v. *Blankespoor* (1957), 350 Mich 347; and *Immanuel Evangelical Lutheran Church* v. *Fromm* (1962), 367 Mich 575.

We further point out that Father Nicoloff and his followers left the plaintiff church and its heirarchy and formed a new diocese which became a constituent of the Russian Orthodox Church Outside of Russia, and attempted to take the property of the plaintiff church with them. It is interesting to note that the membership of the plaintiff church at a meeting on February 21, 1965, voted against any association with the new Nicoloff diocese by a vote of 220 against association and 28 in favor.

The Nicoloff faction construes the 1947 New York State incorporation of the Diocese of America, North and South, and Australia as effecting a departure of the church from the administrative control of the Holy Synod of the Bulgarian Eastern Orthodox Church. It is undisputed that the plaintiff church has always adhered to the tenets, doctrines, beliefs, ritual and teachings of the Mother Church in Bulgaria. The Nicoloff faction cannot legally maintain its position of departing from the control of the Holy Synod of the Bulgarian Eastern Orthodox Church in 1963 based upon their interpretation of the 1947 incorporation, for even if the 1947 incorporation attempted to accomplish what the Nicoloff faction claimed for it, the attempt could not be successful for it would be contrary to law. *Kedroff* v. *Saint Nicholas Cathedral* (1952), 344 US 94 (73 S Ct 143, 97 L Ed 120) and *Kreshik* v. *Saint Nicholas Cathedral* (1960) 363 US 190 (80 S Ct 1037, 4 L Ed 2d 1140).

No error having been committed, the partial summary judgments of the trial court are affirmed. Costs to plaintiff in case No. 5079 and costs to defendants in case No. 5080.

McGregor, J., concurred.

Bronson, J. (*dissenting*). For the reasons set forth in my opinion in *Macedono Church* v. *Macedonian Organization* (1970), 21 Mich App 281, I would vacate the lower court decisions.